In re TELEGLOBE COMMUNICA-
TIONS CORP. et al., Debtors.

Teleglobe USA, Inc. et al., Plaintiffs,

v.

BCE Inc. et al., Defendants.

Bankruptcy No. 02–11518 (MFW).
Adversary No. A–04–53733(MFW).

United States Bankruptcy Court,
D. Delaware.

Aug. 7, 2008.

Nichols, Arsht & Tunnell, John D. Demmy, Esq., Joseph Grey, Joseph H. Huston, Jr., Stevens & Lee, P.C., Paul J. Dougherty III, William F. Taylor, Jr., McCarter & English, Stephen P. Doughty, Lyons, Doughty & Veldhuis, P.A., Brian Edward Farnan, Robert S. Goldman, John C. Phillips, Jr., Phillips, Goldman & Spence, P.A., Megan Nancy Harper, Landis Rath & Cobb, James E. Huggett, Margolis Edelstein, Carl N. Kunz, III, Morris James LLP, Gwendolyn M. Lacy, Jeffrey C. Wisler, Connolly Bove Lodge & Hutz, Ricardo Palacio, Esq., Ashby & Geddes, P.A., Marc J. Phillips, Connolly Bove Lodge & Hutz LLP, Laurie Selber Silverstein, Potter Anderson & Corroon LLP, William David Sullivan, William D. Sullivan, LLC, Thomas D. Walsh, Fox Rothschild LLP, Christopher A. Ward, Polsinelli Shalton Flanigan Suelthaus, Duane David Werb, Werb & Sullivan, Thomas G. Whalen Jr., Stevens & Lee, P.C., Wilmington, DE, Connolly, Bove, Lodge & Hutz, Linda Boyle, Time Warner Telecom, Inc., Littleton, CO, Tomie Burton, Treasurer–Tax Collector, Barbara R. Gross, Esq., Pyle Sims Duncan & Stevenson, APC, San Diego, CA, Daniel J. Carragher, Day Pitney LLP, Boston, MA, Leslie A. Cohen, Liner Yankelevitz Sunshine & Regenstreif, Santa Monica, CA, Michaela Crocker, Vinson & Elkins L.L.P., Clifton R. Jessup, Jr., Greenberg Traurig, Glenn A. Portman, Bank One Center, Helen Elizabeth Weller, Linebarger Goggan Blair & Sampson, LLP, Dallas, TX, Robert L. Eisenbach, III, Gregg S. Kleiner, Cooley Godward Kronish LLP, Christopher Todd Lenhart, Dorsey & Whitney LLP, San Francisco, CA, Michael S. Greger, Allen Matkins Leck Gamble & Mallory, Irvine, CA, Beth–Ann E. Herschaft, Governmental Center, Fort Lauderdale, FL, Bonnie Maria Holcomb, Office of the Attorney General, Los Angeles, CA, Jeffrey A. Kramer, Lowenstein Sandler, P.C.,

---

David C. Albalah, Bracewell & Giuliani LLP, Rita D. Dumain, New York City Law Department, Michael Friedman, Richards Spears Klbbe & Orbe LLP, David M. Posner, Otterbourg, Steindler, Houston & Rosen, Stephen B. Selbst, McDermott Will & Emery LLP, Eric D. Statman, Lovells, New York, NY, D. Scott Barash, Eric R. Markus, Wilmer, Cutler & Pickering, Beatriz T. Saiz, U.S. Department of Justice, Tax Division, Washington, DC, Karen C. Bifferato, Charles J. Brown, Archer & Greiner, P.C., Stuart M. Brown, Edwards Angell Palmer & Dodge LLP, William J. Burnett, Blank Rome LLP, Noel C. Burnham, Montgomery McCracken Walker & Rhoads LLP, L. Jason Cornell, Fox Rothschild LLP, Victoria Watson Counihan, Greenberg Traurig, LLP, Tobey M. Daluz, Ballard Spahr Andrews & Ingersoll LLP, Robert J. Dehney, Morris,

Roseland, NJ, Nancy F. Loftus, Office of the County Attorney, Fairfax, VA, Ronald J. Miller, Division of Employment Security, Jefferson City, MI, Mark Minuti, Saul Ewing LLP, Francis A. Monaco Jr., Monzack and Monaco, P.A., Thomas Paxton, Hughes & Luce LLP, Geraldine E. Ponto, Gibbons, Del Deo, Dolan, et al., Newark, NJ, Rex D. Rainach, Baton Rouge, LA, Steven Rosenthal, ACI Billing Services, Inc., Northridge, CA, Dwight E. Steiner, Fraser Stryker Meusey Olson Boyer, Broomfield, CO, Robert D. Towey, Lowenstein Sandler, Roseland, NJ, John J. Winter, The Chartwell Law Offices, LLP, Norristown, PA, for Creditors.

Rebecca L. Booth, Morgan Lewis & Bockius, Philadelphia, PA, Cynthia L. Collins, Mark D. Collins, Daniel J. DeFranceschi, Shannon Stacy Frazier, John Henry Knight, Michael Joseph Merchant, Mark E. Felger, Jeffrey R. Waxman, Cozen O'Connor, Shelley A. Kinsella, Cooch and Taylor, P.A., Kimberly D. Newmarch, Marcos Alexis Ramos, Christopher M. Samis, Russell C. Silberglied, Richards, Layton & Finger, Wilmington, DE, Marc T. Foster, Rebecca Lee Scalio, for Debtors.

Robert D. Clark, Denver, CO, Charlene D. Davis, Bayard, P.A., Frederick B. Rosner, Jaspan Schlesinger Hoffman, David B. Stratton, Pepper Hamilton LLP, Wilmington, DE, David W. Dykhouse, Patterson, Belknap, Webb, & Taylor, David Neier, Winston & Strawn LLP, Anna C. Palazzolo, Dechert, Conor Desmond Reilly, Gibson, Dunn & Crutcher, New York, NY, Thomas C. Herbertson, Kenneth W. Irwin, Morrison & Foerster LLP, Scott Andrew Shail, Hogan & Hartson, Washington, DC, John R. Knapp, Jr., Cairncross & Hempelmann, P.S., Seattle, WA, Nancy H. Pagliaro, Cornell University, Ithaca, NY, Bryn H. Sherman, Deckelbaum Ogens & Raftery, Bethesda, MD, Derrick M. Talerico, Loeb & Loeb LLP, Los Angeles, CA, for Interested Party.

### OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is a discovery dispute where the Plaintiffs seek the production of documents which the Defendants assert are protected by the attorney-client privilege or attorney work product doctrine (the "Motion to Compel") and a related Motion of the Defendants to exclude testimony of the Plaintiffs' experts as a sanction for the spoliation of information considered in forming their opinions (the "Spoliation Motion"). The Motions are opposed. For the reasons set forth below, the Court will deny both the Spoliation Motion and the Motion to Compel.

### I. BACKGROUND

The Debtors [2] are the wholly owned United States subsidiaries of a Canadian company, Teleglobe, Inc. ("Teleglobe"). Teleglobe is a wholly owned subsidiary of BCE, Inc. ("BCE"). Teleglobe and the Debtors filed petitions under the Canadian Companies' Creditors Arrangement Act ("CCCAA"). In addition, the Debtors filed voluntary chapter 11 petitions under the

---

1. This Opinion and the accompanying Findings of Fact constitute the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

2. The Debtors in the chapter 11 case are Teleglobe USA, Inc.; Optel Communications,

Inc.; Teleglobe Holdings (U.S.) Corp.; Teleglobe Marine (U.S.) Inc.; Teleglobe Holding Corp.; Teleglobe Telecom Corp.; Teleglobe Investment Corp.; Teleglobe Submarine, Inc.; Teleglobe Communications Corp.; Teleglobe Luxembourg, LLC; Teleglobe Puerto Rico, Inc.

Bankruptcy Code in the District of Delaware.

The discovery dispute has had a tortured path. On or about May 26, 2004, the Debtors and the Creditors' Committee (collectively "the Plaintiffs") filed an adversary proceeding[3] against BCE and various officers and directors of BCE (the "Defendants") in the Bankruptcy Court. During that proceeding, the Plaintiffs filed the Motion to Compel. The District Court withdrew the reference of the adversary proceeding and referred the discovery dispute to a Special Master.

After reviewing the approximately 1,000 withheld documents, the Special Master held that they must all be produced. The Special Master concluded that the Defendants had over-designated as privileged many of the documents (ultimately withdrawing their claim of privilege to thousands of pages of documents) and that production of all of the documents as a sanction might be appropriate. Further, the Special Master concluded that the Plaintiffs were entitled to all documents relating to the joint representation of BCE and Teleglobe because BCE could not withhold them from Teleglobe and Teleglobe had waived the privilege in favor of the Plaintiffs in its CCCAA plan. The Special Master also concluded that any privilege with respect to documents from or to BCE's outside counsel had been lost because those documents had been sent to in-house counsel who was jointly representing BCE and Teleglobe.

On June 2, 2006, the District Court accepted the Special Master's recommendations and reasoning and ordered the production of all of the withheld documents. *Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, No. Civ. 04–1266–SLR, 2006 WL 2567880, at * 2 (D.Del. June 2, 2006).

In a decision dated July 17, 2007, the Third Circuit reversed. *Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345 (3d Cir.2007). The Third Circuit remanded for additional findings of fact on the following issues: (1) Whether any attorneys jointly represented BCE and the Debtors on a matter of common interest, in which case any documents within the scope of that joint representation would be discoverable. (2) Whether the fiduciary exception to the attorney-client privilege[4] is applicable. (3) Whether the attorney-client privilege should be abrogated as a sanction for the Defendants' abuse of the discovery process because of "bad faith, wilfulness, or fault" on the part of the Defendants or their counsel. *Id.* at 386–87.

On remand, the District Court referred the adversary proceeding back to the Bankruptcy Court. After consultation with counsel for the parties, the Court scheduled an evidentiary hearing on the factual issues identified by the Third Circuit for determination in the Motion to Compel.

In preparation for the hearing on the Motion to Compel, the parties conducted additional discovery, including expert discovery. On July 17, 2007, the Defendants filed the Spoliation Motion[5] asking the

---

**3.** The suit alleges claims for breach of contract, promissory estoppel, misrepresentations, breach of fiduciary duty, and aiding and abetting a breach of fiduciary duty.

**4.** The Third Circuit agreed with the Defendants that the fiduciary exception does not apply to documents covered by the attorney work product doctrine. *Teleglobe*, 493 F.3d

at 385. The factual issue of whether the documents in question are covered by the attorney-client privilege or the attorney work product doctrine was also remanded. *Id.*

**5.** The Spoliation Motion had originally been filed in the District Court on May 23, 2006; on December 20, 2006, it was denied without

Court to exclude the testimony and/or reports of two of the Plaintiffs' expert witnesses (Paul Charnetzki and Carlyn Taylor) because they had destroyed notes, drafts of their expert reports, and other information that the Defendants contended the experts had considered in forming their opinions. The Plaintiffs opposed the Spoliation Motion and a hearing was held on October 24, 2007. At the conclusion of the hearing, the Court denied the Spoliation Motion, but directed counsel for the Plaintiffs to produce (to the Defendants and to the Court) its notes of a meeting held between counsel and the experts on March 1, 2006, and copies of emails or other communications in which counsel or other experts had forwarded comments or information to the experts for consideration in forming their opinions.

In compliance with the October 26 Order, the Plaintiffs produced 11 boxes of documents. On December 3, 2007, the Defendants filed a response to that document production contending that the documents produced are no substitute for the destroyed documents and reiterating their request that the Court preclude the experts' testimony and/or reports at the trial. Specifically, the Defendants complain that the Plaintiffs have produced no notes of the March 1, 2006, meeting between the experts and counsel. Instead, the Defendants contend that the Plaintiffs have produced documents which the experts already identified as having been considered by them in preparing their reports.

The evidentiary hearing on the Motion to Compel proceeded on December 11 to 14, 2007. The Court permitted the experts to testify, reserving decision on whether to exclude their expert reports.

On April 28, 2008, the parties submitted proposed findings of fact, conclusions of law and briefs. The matter is ripe for decision.

## II. JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the District Court's referral order dated July 17, 2007.

## III. DISCUSSION

### A. Spoliation Motion

After oral argument held on October 24, 2007, the Court concluded that Rule 26(a)(2)(B) did not impose any obligation on a party, its experts or counsel, to preserve and produce drafts of an expert's report. The Court did, however, conclude that the attorney work product doctrine did not protect information conveyed by an attorney to a testifying expert and, therefore, such information should have been produced. The Court rejected the Defendants' assertion that Rule 37 mandates preclusion of testimony by the Plaintiffs' experts, concluding instead that it had discretion to fashion an appropriate remedy. The Court found preclusion of testimony by the Plaintiffs' experts would cause a substantial hardship for the Plaintiffs. Accordingly, as a sanction, the Court directed

prejudice to being renewed after the appeal was concluded. (D.Ct.D.I.296.) References to the record are as follows: (1) "Admitted Facts" for the Statement of Facts Which Are Admitted and Require No Proof, attached to the parties' Pre–Hearing Order as Exhibit 1A, (2) "Hr' g Tr. [page no.: line no.], [date]" for the transcript of the hearings, (3) "PX # " for the Plaintiffs' exhibits, (4) "DX # " for the Defendants' exhibits, (5) "D.Ct. D.I. # " for the docket in the District Court case, (6) "B.Ct. D.I. # " for the docket in the main case in the Bankruptcy Court, (7) "B.Ct. Adv. D.I. # " for the docket in the adversary proceeding in the Bankruptcy Court, and (8) "Priv. Doc. Tab # " for the privileged documents cited in the Special Masters' Final Report dated February 22, 2006.

that counsel for the Plaintiffs produce copies of any communications they had with their experts, including any notes that counsel had retained from the March 1 meeting with the experts. The Court reserved decision on whether any further sanction was appropriate after review of the additional documents produced. The Court takes this opportunity to further clarify its ruling on the Spoliation Motion.

After their review of the additional documents produced by Plaintiffs' counsel in response to the Court's directive, the Defendants argue that the documents produced are no substitute for the draft expert reports to which they allege they are entitled under Rule 26(a)(2)(B). Accordingly, they ask the Court to exclude the experts' reports, as a further sanction for the spoliation of the experts' draft reports and notes of their consultations with each other and with Plaintiffs' counsel.

■ "Spoliation is the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction." *Univ. of Pittsburgh v. Townsend,* No. 3:04–cv–291, 2007 WL 1002317, at *3 (E.D.Tenn. Mar.30, 2007) *(quoting McDaniel v. Transcender, LLC,* 119 Fed.Appx. 774, 782 (6th Cir.2005)).

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure provides in relevant part that a party must disclose the identity of any testifying expert and "this disclosure must be accompanied by a written report—prepared and signed by the witness.... The report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the data or other information *considered* by the witness in forming them...." Fed.R.Civ.P. 26(a)(2)(B) (emphasis added).

■ Prior to 1993, the Rule required production only of the information on which the expert *relied* in forming his opinion; in 1993 the Rule was amended to require the production of all data which the expert *considered.* Information considered by an expert witness includes not only information on which the expert relied but also all information that a testifying expert generated, reviewed, reflected upon, read, and/or used in connection with the formulation of his opinions, even if the testifying expert ultimately rejected the information. *Trigon Ins. Co. v. United States,* 204 F.R.D. 277, 282 (E.D.Va.2001) (noting that "considered" is broader than the term "relied upon" used in the prior rule).

Some courts have held that a necessary implication of the requirement to disclose all information which an expert considered is the duty to preserve that information. *See, e.g., Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.,* 412 F.3d 745, 751 (7th Cir.2005) (concluding that Rule 26(a)(2)(B) "does not require merely that the party disclose data that it happens to have retained; it must disclose all the data that an expert that it retained to testify at trial 'considered,' implying that it must retain those data, as otherwise it could not disclose them."); *Trigon,* 204 F.R.D. at 282 (concluding that Rule 26(a)(2)(B) "requires, on this record, the retention and production of draft reports and the correspondence reviewed by the testifying expert."). But see *Adler v. Shelton,* 343 N.J.Super. 511, 778 A.2d 1181, 1192 (N.J.Super. Ct. Law Div.2001) (concluding that while drafts of expert reports are discoverable, "[e]xperts familiar with the litigation process usually destroy their draft reports and the rules do not forbid this.").

### 1. Draft Reports

■ The Defendants argue that Rule 26(a)(2)(B) requires that the Plaintiffs' ex-

perts produce all drafts of their reports.[6] *See, e.g., Elm Grove Coal Co. v. Director, Office of Workers' Compensation Programs,* 480 F.3d 278, 301 (4th Cir.2007) (concluding that administrative law judge rule of procedure which was similar to Rule 26 mandated the production of draft reports because "we are unable, in these circumstances, to agree that [the] expert witnesses could be properly and fully cross-examined in the absence of the draft reports and attorney-expert communications sought by" the plaintiff); *Trigon,* 204 F.R.D. at 282; *Krisa v. Equitable Life Assurance Soc'y,* 196 F.R.D. 254, 256 (M.D.Pa.2000) (concluding that experts' draft reports are discoverable under Rule 26); *Adler,* 778 A.2d at 1192 (concluding that draft expert report which contained no attorney work product must be produced).

In one of the cases cited by the Defendants, however, the Court acknowledged that there are "cogent reasons" why an expert may not be required to preserve and produce "the drafts prepared solely by that expert while formulating the proper language in which to articulate that experts' [sic] own, ultimate opinion arrived at by the expert's own work or those working at the expert's personal direction." *Trigon,* 204 F.R.D. at 283 n. 8.

The Plaintiffs note that none of the cases cited by the Defendants are by the Third Circuit or any court in this District. In addition, they argue that recent cases have concluded that experts have no duty to retain draft reports or produce them absent a pending request for production of drafts. *See, e.g., Townsend,* 2007 WL 1002317, at *3 (finding that Rule 26(a)(2) does not "impose an 'affirmative duty' upon an expert to preserve 'all documents,' particularly report drafts.... Nor does Rule 26(a)(2) require that draft reports be disclosed as part of an expert disclosure."); *McDonald v. Sun Oil Co.,* 423 F.Supp.2d 1114, 1122 (D.Or.2006) (concluding that Rule 26 "does not require the production of an expert's working notes" and that "[i]t was reasonable for the experts to assume that retention of th[e] notes [at issue] was unnecessary" because experts "are not 'required to retain every scrap of paper' created in preparing their opinions."). Like the instant case, the Townsend case involved draft reports and email edits from counsel that were not preserved until a request was made for them. 2007 WL 1002317, at *3.

Because of the split of authority on this issue and the ambiguity in the Rule, the Plaintiffs note that the American Bar Association officially adopted a policy that "an expert's draft reports should not be required to be produced to an opposing party" and recommended that the rules be amended to clarify that draft reports need not be produced in discovery. *See* ABA Recommendation and Report No. 120A, at 1 (Aug. 7–8, 2006).

The Court is not convinced that the plain language of Rule 26(a)(2)(B) imposes an obligation on a party or its experts to preserve and produce drafts of an expert's report. *See, e.g., Berckeley Inv. Group, Ltd. v. Colkitt,* 259 F.3d 135, 142 n. 7 (3d Cir.2001) ("The Supreme Court and this Court have repeatedly held that the Federal Rules of Civil Procedure, like any other statute, should be given their plain meaning."). The Rule does not expressly include draft opinions in the list of what the expert must disclose. Instead, the

---

**6.** The Defendants also suggest that the failure of the Plaintiffs' experts to maintain drafts of their reports was in violation of the parties' agreement to produce all drafts of their experts' reports. This agreement, however, was not reached (or even discussed) until after the draft reports were destroyed. (D.Ct.D.I.276.)

Rule requires that an expert's report contain a list of the data and other information on which he relied. Fed.R.Civ.P. 26(a)(2)(B). It does not seem logical that the Rule would require the final report to include a list of all the drafts of that report. Further, because most experts now draft their reports on the computer, adding to and subtracting from the document, it would be impractical to require the production of all drafts. For example, any time an expert added or subtracted a section, a paragraph, a sentence or even a word, the Defendants' reading of the Rules would require the expert to save the draft and preserve it for production later. This is a completely unworkable reading of the Rules and would mire the courts in battles over each draft of an expert's report. The Court concludes that this interpretation comports with neither the plain meaning of the Rule nor its policy.

The Defendants argue, however, that draft reports fall into the category of data or information "considered" by the expert and therefore must be produced. The Court disagrees. The expert does not really "consider" prior drafts in forming his opinion; the prior drafts are simply preliminary iterations of his opinion. Rather than "consider" his prior thoughts and statements, in editing the report the expert is considering the underlying data which forms the basis of the revisions. The data that formed the basis of the draft and final reports of the Plaintiffs' experts in this case have already been disclosed in full and there is no allegation that any of that information was destroyed. Consequently, the Court concludes that the destruction of their draft reports by the Plaintiffs' experts does not constitute the spoliation of evidence.

### 2. Attorney Work Product Doctrine

■ The Defendants argue that the draft reports are important in this case,

however, because they would have permitted the Defendants to cross examine the Plaintiffs' experts more effectively. In particular, they argue that changes made to the reports as a result of the March 1, 2006, meeting would have demonstrated that the experts' opinions were influenced by the other experts and by the attorneys for the Plaintiffs. They argue that because the experts "considered" the comments of the other experts and attorneys, they had an obligation to preserve and produce those comments which were reflected as changes to the draft reports.

The Plaintiffs (and their experts) categorically deny that there were any substantive changes to the experts' reports as a result of the March 1 meeting or other conversations with the Plaintiffs' attorneys. They argue that the one draft of Taylor's report which was produced (dated February 24, 2006) did not differ in any meaningful respect from the final report filed on March 8, 2006, thereby proving that her opinion was not changed as a result of the March 1 meeting. The Plaintiffs argue that the other drafts which were destroyed similarly would not contain any relevant information.

The Plaintiffs also note that the Defendants' experts also consulted with counsel and incorporated counsel's comments into their reports or excluded sections from their reports at counsel's suggestion. Although drafts of those reports were furnished, the Plaintiffs argue that it is impossible to determine which changes were counsel's and which were the experts'.

This argument, however, raises a threshold issue: whether the comments of counsel or other experts must be disclosed. Those comments, to the extent they discuss strategy or theories of the case, are protected by the attorney work product doctrine. *Hickman v. Taylor*, 329 U.S.

495, 512, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (enunciating the attorney work product doctrine as "the general policy against invading the privacy of an attorney's course of preparation" for trial). In confirming the importance of the attorney work product doctrine, the Supreme Court stated that:

Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney .... [because] it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.

*Id.* at 510–11, 67 S.Ct. 385.

The attorney work product doctrine has been incorporated into Rule 26(b)(3) which states that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed.R.Civ.P. 26(b)(3)(A).

There is a split of authority, however, regarding whether amended Rule 26(a)(2)(B)—which requires that testifying experts produce all information considered by them in forming their opinion—trumps Rule 26(b)(3), which protects attorney work product.

Many courts have held that Rule 26(a)(2)(B) now requires the production of any document which a party's attorney has given to the expert, concluding that by giving it to the expert the attorney work product doctrine has been waived. *See,*

*e.g., Elm Grove,* 480 F.3d at 301 (in analyzing ALJ rule similar to Rule 26, agreeing with the reasoning of those courts which have held that Rule 26 mandates such disclosure); *Reg'l Airport Auth. of Louisville v. LFG, LLC,* 460 F.3d 697, 717 (6th Cir.2006) (concluding that "Rule 26 creates a bright-line rule mandating disclosure of all documents, including attorney opinion work product, given to testifying experts."); *In re Pioneer Hi–Bred Int'l, Inc.,* 238 F.3d 1370, 1375 (Fed.Cir.2001) (concluding that revised Rule 26 "proceeds on the assumption that fundamental fairness requires disclosure of all information supplied to a testifying expert in connection with his testimony. Indeed, we are quite unable to perceive what interests would be served by permitting counsel to provide core work product to a testifying expert and then to deny discovery of such material to the opposing party."); *Dyson Tech. Ltd. v. Maytag Corp.,* 241 F.R.D. 247, 248 (D.Del.2007) (concluding that "Rule 26(a)(2)(B) requires the disclosure of all materials considered by Dyson's experts, regardless of Dyson's claims of attorney-client privilege or work-product privilege."); *Synthes Spine Co., L.P. v. Walden,* 232 F.R.D. 460, 464 (E.D.Pa.2005) ("This Court interprets Rule 26(a)(2)(B) as requiring disclosure of all information, whether privileged or not, that a testifying expert generates, reviews, reflects upon, reads, and/or uses in connection with the formulation of his opinions, even if the testifying expert ultimately rejects the information."); *B.C.F. Oil Refining, Inc. v. Consol. Edison Co. of New York, Inc.,* 171 F.R.D. 57, 66–67 (S.D.N.Y.1997) (concluding that amended Rule 26 and the advisory committee's notes are "evidence that the drafters of the rule understood the policies behind expert disclosure and the work product doctrine and have decided that disclosure of material generated or con-

sulted by the expert is more important."); *Karn v. Ingersoll–Rand Co.,* 168 F.R.D. 633, 639 (N.D.Ind.1996) (concluding that revised Rule 26(a)(2) mandating disclosure of all information received by an expert trumps Rule 26(b)(3) which protects attorney work product); *Intermedics, Inc. v. Ventritex, Inc.,* 139 F.R.D. 384, 387 (N.D.Cal.1991) (holding that "absent an extraordinary showing of unfairness that goes well beyond the interests generally protected by the work product doctrine, written and oral communications from a lawyer to an expert that are related to matters about which the expert will offer testimony are discoverable, even when those communications otherwise would be deemed [attorney] opinion work product."). In support of this conclusion, the *Karn* Court noted that

> The "bright-line" interpretation [of Rule 26 mandating disclosure of all information received by a testifying expert] expressed here also makes good sense on several policy grounds: effective cross examination of expert witnesses will be enhanced; the policies underlying the work product doctrine will not be violated; and, finally, litigation certainty will be achieved-counsel will know exactly what documents will be subject to disclosure and can react accordingly.

168 F.R.D. at 639.

Those courts rely, in part, on the advisory committee's notes which state that "[g]iven this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinion—whether or not ultimately relied upon by the expert—are privileged or otherwise protected from disclosure when such persons are testifying or being deposed." Fed. R.Civ.P. 26 advisory committee's notes (1993). The policy behind the mandated disclosure articulated by the courts is to avoid the

> risk … that the lawyer will do the thinking for the expert, or, more subtly, that the expert will be influenced, perhaps appreciably, by the way the lawyer presents or discusses the information.… The risks would be reduced, arguably considerably, if it were known that all communications from counsel that accompany the transmission of data [to the expert] would be reviewable by other experts (retained by opposing parties or appointed by the court) and made known to the trier of fact.

*Intermedics,* 139 F.R.D. at 394.

The quotation from the advisory committee's notes, however, is truncated by the Courts which say it supports production of attorney work product received by an expert. In fact, the beginning of that note clarifies that the expert "is to disclose the *data and other information* considered by the expert and any exhibits or charts that summarize or support the expert's opinions." Fed.R.Civ.P. 26 advisory committee's notes (1993) (emphasis added). This suggests that only factual data and information must be produced, not the legal theories or other attorney work product.

As a result, many other courts have determined that despite the amendment to Rule 26, information which is protected by the attorney work product doctrine need not be disclosed even if it has been provided to a testifying expert. Notably, the Third Circuit is in this category. *See, e.g., In re Cendant Corp. Sec. Litig.,* 343 F.3d 658, 665 (3d Cir.2003) *(citing Bogosian v. Gulf Oil Corp.,* 738 F.2d 587 (3d Cir.1984)); *St. Marys Area Water Auth. v. St. Paul Fire & Marine Ins. Co.,* Civ. No. 1:CV–04–1593, 2006 WL 1670281, at *2 (M.D. Pa. June 15, 2006) ("While other courts have found the [ruling in] *Bogosian* to be 'inap-

posite' after the 1993 amendments ... *Cendant Corp.* makes it clear that *Bogosian's* holding is still binding on lower courts.... As such, we must find that core attorney work-product cannot be discovered under Rule 26 even if it is disclosed to an expert."); *Smith v. Transducer Tech., Inc.*, 197 F.R.D. 260, 262 (D.Vi.2000) (concluding that while *Bogosian* "was decided prior to the 1993 amendments ... such view still has adherents post 1993") (citations omitted); *Krisa*, 196 F.R.D. at 260 (based on the language of Rule 26 and the reasoning in *Bogosian*, concluding that "disclosure of core work product to a testifying expert does not abrogate the protection accorded such information" by the attorney work product doctrine); *Moore v. R.J. Reynolds Tobacco Co.*, 194 F.R.D. 659, 664 (S.D.Iowa 2000) (holding that draft expert reports are protected attorney work product because "[e]ven when opinion work product is shared with an expert witness in preparation for testifying at trial, [Eighth Circuit precedent] and a reading of Rule 26(b)(3) compel this court to conclude that, in this Circuit, such opinion work product has nearly absolute immunity from discovery."); *Magee v. The Paul Revere Life Ins. Co.*, 172 F.R.D. 627, 642 (E.D.N.Y.1997) ("Having reviewed the relevant case law, the text of Rule 26(a) and (b) and the associated commentary provided by the advisory committee, the Court holds that 'the data or other information considered by [an expert] witness in forming [his] opinions' required to be disclosed ... under Rule 26(a)(2)(B) extends only to factual materials, and not to core attorney work product considered by an expert."); *Haworth, Inc. v. Herman Miller, Inc.*, 162 F.R.D. 289, 295 (W.D.Mich.1995) ("This Court reads [Rule 26] as meaning only that all factual information considered by the expert must be disclosed in the report."); *All West Pet Supply Co. v. Hill's Pet Prods. Div., Col-gate–Palmolive Co.*, 152 F.R.D. 634, 638 (D.Kan.1993) (concluding that "the plaintiff did not waive the protection afforded by Rule 26(b)(3) for attorney work product by sharing the documents in question with its expert witness.").

In *Cendant*, the Third Circuit analyzed the purported conflict between Rule 26(b)(3) which protects attorney work product from discovery and Rule 26(b)(4) which deals with depositions of testifying and non-testifying experts. 343 F.3d at 665. The Court concluded that Rule 26(b)(3) provides an independent basis for protection of attorney work product from discovery. In so doing, the Court referenced its decision in *Bogosian*, in which it had concluded that attorney work product is protected under Rule 26(b)(3) from disclosure by a testifying expert. *Id. (citing* 738 F.2d at 594).

At the oral argument held on October 24, 2007, the Court was persuaded to follow a decision of the District Court which concluded that *Bogosian* was no longer good law as a result of the amendments to Rule 26. *Dyson*, 241 F.R.D. at 251. The District Court concluded that the Third Circuit's decision in *Cendant* was distinguishable because it dealt with the limited disclosures required of a non-testifying expert as opposed to the broad disclosures required of a testifying expert. *Id.* at 250 n. 3.

On further reflection, however, this Court believes that its initial conclusion was incorrect and concludes that a testifying expert does not have to produce documents which are protected as core attorney work product (i.e., reflects the attorney's mental impressions and trial strategy). In concluding that Rule 26 disclosures required of non-testifying experts did not trump the attorney work product doctrine in *Cendant*, the Third Circuit cited with approval its decision in *Bogosian* that Rule 26 disclosures by tes-

tifying experts did not trump the attorney work product doctrine. *Cendant*, 343 F.3d at 665. Therefore, the Court concludes that the amendments to Rule 26 did not change the Third Circuit's fundamental decision: that the work product doctrine articulated in Rule 26(b)(3) is not trumped by the need to disclose information contained in other provisions of that Rule. This Court is bound by the decisions in *Cendant* and *Bogosian* and therefore concludes that the Plaintiffs' experts were not required to produce any notes of comments made by the attorneys.

This conclusion is bolstered by the fact that Rule 26(b)(3) was amended after the *Cendant* decision. The amendment eliminated the language in the first sentence ("[s]ubject to the provisions of subdivision (b)(4)") that the *Cendant* Court analyzed. Instead, the amended Rule states the attorney work product doctrine affirmatively without the proviso:

> Ordinarily, a party may not discover documents or tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).

Fed.R.Civ.P. 26(b)(3)(A). In addition, while the Rule continues to permit discovery of attorney work product upon a showing that there is a substantial need and that it cannot be obtained otherwise without undue hardship, the Rule still requires the Court to protect "core" attorney work product by mandating:

> If the Court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed.R.Civ.P. 26(b)(3)(B).

This language and a more thorough reading of the relevant cases convinces the Court that attorney work product continues to be protected by Rule 26 even if it is shared with a testifying expert. The reasoning of the *Krisa* Court on this point is persuasive:

> An interpretation of Rule 26 that holds that a party must produce documents containing work product that are disclosed to its expert ignores the language of Fed.R.Civ.P. 26(b)(3), which requires the production of documents containing work product only when the requesting party shows necessity and undue hardship to obtain the substantial equivalent of such documents by other means. An interpretation of Rule 26 that mandates the production of core work product disclosed to an expert would render the language in Rule 26(b)(3) superfluous. It is a canon of construction that "statutes should be read so far as possible to give independent effect to all their provisions."

196 F.R.D. at 260. *Accord All West Pet Supply*, 152 F.R.D. at 639 (concluding that a party's "burden under Rule 26(b)(3) [to show substantial need and undue hardship] cannot be avoided simply because the attorney's work product document in question was transmitted to his client's expert witness and considered in the course of preparing an expert opinion for purposes of testifying at trial.")

> For the high privilege accorded attorney opinion work product not to apply would require clear and unambiguous language in a statute. *See Hickman [v. Taylor]*, 329 U.S. at 514[, 67 S.Ct. 385]. No such language appears [in Rule 26]. The Supreme Court in *Hickman* explained that it would be "a rare situation" which would justify disclosure of attorney opinion work product.

*Haworth*, 162 F.R.D. at 295.

Thus, the Court finds that any comments received by the Plaintiffs' experts

from Plaintiffs' counsel or non-testifying expert are protected by the attorney work product doctrine and did not have to be produced.

### 3. Sanctions

■ Even if there were some discoverable information contained in the draft reports which were not preserved, the Court concludes that the drastic remedy sought by the Defendants (exclusion of the experts' testimony and/or reports) is not warranted by the facts of this case.

The Defendants rely on Rule 37(c)(1) of the Federal Rules of Civil Procedure which states in relevant part: "A party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at trial, [or] at a hearing ... information not so disclosed." Fed.R.Civ.P. 37(c)(1). They contend that this sanction is automatic and mandatory. *See, e.g., Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir.2005) (affirming exclusion of expert's testimony for failure to disclose); *Poulis–Minott v. Smith*, 388 F.3d 354, 358 (1st Cir.2004) ("The required sanction in the ordinary case is mandatory preclusion."); *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir.1998) ("[T]he sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless."); *American Stock Exchange, LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y.2002) ("Rule 37(c)(1)'s preclusionary sanction is 'automatic' absent a determination of either 'substantial justification' or 'harmlessness.' ").

The Plaintiffs assert that the Court has the discretion not to preclude the expert's testimony and reports. Specifically, the Plaintiffs note that Rule 37(c)(1) provides that "[i]n addition to *or in lieu of* th[e]

sanction [of excluding evidence at trial], the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions." Fed.R.Civ.P. 37(c)(1) (emphasis added).

The Defendants reply that this provision was intended to permit the Court to impose additional, not lesser, penalties. *See* Fed.R.Civ.P. 37(c)(1) advisory committee's note (1993). *See also* 7 Moore's Federal Practice § 37.61, at 124 ("The principal reason this provision was added ... was to provide courts with effective means to discipline parties who might be tempted not to disclose evidence that would be helpful to an opposing party.").

■ The Court agrees with the Plaintiffs that preclusion under Rule 37(c) should be applied at the Court's discretion. The Rule expressly states that other sanctions can be imposed "in lieu of" preclusion, not just in addition to preclusion. Fed.R.Civ.P. 37(c)(1). Even the cases cited by the Defendants acknowledge that the sanction of exclusion is subject to the trial court's discretion. *See, e.g., Hammel*, 407 F.3d at 869 (concluding that the district court did not abuse its discretion in excluding testimony for failure to comply with Rule 26(a)(2)(C)); *Poulis–Minott*, 388 F.3d at 359 (finding that the district court did not abuse its discretion in denying in part plaintiff's motion to strike late-filed affidavit of an expert); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir.2003) (concluding that district court did not abuse its discretion when it permitted expert to testify despite failure to disclose); *Mid–America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1363 (7th Cir.1996) (holding that "whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court"); *Design Strategies, Inc. v. Davis*, 228 F.R.D. 210, 212 (S.D.N.Y.2005) ("Even assuming that Defendants did vio-

late some aspect of Rule 26(e) and that that violation is not substantially justified, though, the Court concludes that Rule 37(c)(1)'s automatic preclusionary sanction is not triggered because there is no basis on the record before the Court on which to find that permitting [the witness] to testify would unjustly harm [ the plaintiff].").

█ Further, the courts agree that the sanction of preclusion of evidence is a harsh punishment which should be imposed only in the most extreme circumstances. *See, e.g., Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir.1997) ("[T]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence."); *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir.1988) (noting that the "harshest sanctions available are preclusion of evidence and dismissal of the action" and "should be imposed only in rare situations."); *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 111 (E.D.Pa.2005) ("In choosing an appropriate sanction for the spoliation of evidence, courts should select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim.") (internal citation omitted); *Trigon*, 204 F.R.D. at 288 (concluding that the "assessment of sanctions depends most significantly on the blameworthiness of the offending party and the prejudice suffered by the opposing party."); *Kremsner v. Fortuna–Sas*, Civ. A. No. 87–1202, 1989 WL 70687, at *1 (E.D.Pa. June 23, 1989) ("Preclusion of testimony ... [is an extreme sanction] to be imposed only in rare

situations .... [because it] can be tantamount to dismissal.").

█ In determining whether the extreme sanction of barring an expert's report and testimony because of the spoliation of evidence is warranted, the Third Circuit has articulated the following test:

> We believe the key considerations in determining whether such a sanction is appropriate should be: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir.1994). In that case, the Third Circuit concluded that the District Court's sanction of granting judgment in favor of the defendant was not justified because the defendant did not suffer severe prejudice and the plaintiff's fault was limited.[7]

### a. Degree of Fault of Plaintiffs

The Defendants argue that the Plaintiffs' degree of fault is high in this case because the destruction was deliberate rather than inadvertent. The Plaintiffs respond that because of the split of authority on whether draft reports and notes of discussions with counsel must be maintained and produced, their degree of fault is not high.

---

7. In *Schmid* the plaintiff's expert had disassembled the saw involved in the plaintiff's accident to determine why its guard had failed. 13 F.3d at 77. Because the plaintiff alleged the saw was defectively designed (rather than defectively manufactured), the Court concluded that the defendant's need to examine the actual saw was limited and that its defense could be proven as well or better by inspecting and testing multiple saws of the same design. *Id.* at 79–80.

The Defendants argue further that the failure to preserve the draft reports was not substantially justified. Courts have held that the argument that the documents were destroyed in accordance with normal document destruction policies is frivolous because "a firm's document-retention policy cannot trump Rule 26(a)(2)(B)." *Fidelity*, 412 F.3d at 751. *Accord Trigon*, 204 F.R.D. at 289.

The Court agrees with the Plaintiffs that their degree of fault in this case is de minimis. The Plaintiffs' experts did not take physical documents or other evidence and destroy them. *Cf. Schmid*, 13 F.3d at 77 (expert "destroyed" evidence by disassembling defective saw and yet no sanction was imposed). Rather, the Plaintiffs' experts simply made corrections to their reports on their computers and failed to save prior drafts. It appears that the Defendants' experts did the same. It would be impossible for the Court to require that all "drafts" of expert reports be produced because it might require that an expert retain and print his report every time a single change was made to it. This is not required to understand the basis for an expert's opinion and would impede rather than aid cross-examination of the expert.

This case does not involve the wanton destruction of physical evidence that the Rules mean to prevent. Judge Posner in the *Fidelity* case acknowledged that "[t]here is no legal duty to be a pack rat.... [A testifying expert] is not required to retain every scrap of paper that he created in the course of his preparation—only documents that would be helpful to an understanding of his expert testimony or that the opposing party might use in cross-examination [need be preserved and produced]." 412 F.3d at 751. In that case, the Seventh Circuit concluded that the extreme sanction of disallowing the expert's testimony was not warranted and

that the expert should have been permitted to testify on areas that were not related to the interview notes that had been physically destroyed. *Id.* at 752.

■ Even if the Plaintiffs were at fault (or not substantially justified in their actions), the Court may still deny the motion to exclude the experts' reports and testimony if it finds no prejudice to the Defendants.

### b. *Degree of Prejudice Suffered by Defendants*

The Plaintiffs argue that no preclusion is necessary under Rule 37(c)(1) because their failure to disclose was harmless. Specifically, the Plaintiffs contend that the Defendants have had sufficient opportunity to examine the experts on what was discussed at the March 1, 2006, meeting and the basis of their expert opinions, which were not influenced by any comments received from counsel or the other experts. The Defendants contend that preclusion of the experts' testimony and reports is appropriate in this case because the failure to maintain the drafts and notes of comments received from others deprived the Defendants of powerful cross-examination materials. *See, e.g., Am. Fid. Assurance Co. v. Boyer*, 225 F.R.D. 520, 522 (D.S.C.2004) ("[I]t is essential during pretrial discovery that the parties be able to discover 'not only what an opposing expert's opinions are, but also the manner in which they were arrived at, what was considered in doing so, and whether this was done as a result of an objective consideration of the facts, or directed by an attorney advocating a particular position.'") *(quoting Musselman v. Phillips*, 176 F.R.D. 194, 200 (D.Md.1997)); *Karn*, 168 F.R.D. at 639 ("[U]seful cross examination and possible impeachment can only be accomplished by gaining access to all of the information

that shaped or potentially influenced the expert witness's opinion.").

In this case, the Court finds that the prejudice to the Defendants is limited; the Defendants were able to cross-examine the Plaintiffs' experts in depositions and at the December hearings. The Defendants had all the data which the Plaintiffs' experts considered save possible comments to their draft reports provided in the March 1 meeting or in later telephone conversations with the Plaintiffs' attorneys and the other experts.

> As the Third Circuit noted in *Bogosian,* cross-examination of the expert can be comprehensive and effective on the relevant issue of the basis for an expert's opinion without an inquiry into the lawyer's role in assisting with the formulation of the theory.... [T]he marginal value in the revelation on cross-examination that the expert's view may have originated with an attorney's opinion or theory does not warrant overriding the strong policy against disclosure of documents consisting of core attorney's work product.

738 F.2d at 595. *See also Townsend,* 2007 WL 1002317, at *5 (declining to impose any sanctions for experts' failure to preserve emails from counsel because it found "that the defendants have not been prejudiced by the destruction of these communications, as the defendants have been able to fully cross-examine the witnesses...."); *Haworth,* 162 F.R.D. at 295–96 ("[A] more effective cross-examination and impeachment of the opposing party's expert witness ... is not the type of *circumstance* the Supreme Court contemplated would overcome the strong policy against disclosing an attorney's opinion work product. The risk of an attorney influencing an expert witness does not go unchecked in the adversarial system, for the reasonableness of an expert opinion can be judged

against the knowledge of the expert's field and is always subject to the scrutiny of other experts."); *Adler,* 778 A.2d at 1190–91 (stating that "[t]he central inquiry on cross examination of an expert witness ... is not the question of if and to what extent the expert was influenced by counsel; rather it is this: what is the basis of the expert's opinion. Cross examination on the adequacy and reliability of the stated basis of the expert's opinion can be conducted effectively absent a line of questioning on counsel's role in assisting the expert."). *See generally* ABA Recommendation and Report No. 120A, at 5, 11 (Aug. 7–8, 2006) (concluding that there was "no evidence, empirical or otherwise, that suggests that the requirement to produce drafts, to the extent they exist, provides a better method for presenting and assessing an expert's trial testimony[,] .... has improved the quality of justice, or that without that disclosure, counsel or the trier of fact has been hindered in the ability to test the merits of an expert's opinion.").

Further, the Court notes that the danger articulated by many courts (that the trier of fact could be misled by an expert's testimony which is influenced by attorneys) is of much less concern in a bench trial than a trial by jury. *See, e.g., In re Unisys Sav. Plan Litig.,* 173 F.3d 145, 162 (3d Cir.1999) ("While improper admission of evidence is usually harmless error in a bench trial, the improper *exclusion* of an expert witness who would have offered a party's sole expert testimony on an element of its case ordinarily is not harmless."). The real issue is whether the expert's opinion is valid; this can be tested by cross-examination of the expert and the presentation of a rebuttal expert. In this case, the Defendants were able to do this adequately.

In addition, both Plaintiffs' experts testified that comments from the attorneys and

the other experts at the March 1 meeting (or in phone calls) did not change their opinions. This is substantiated by the draft opinion that Taylor produced from her laptop. That report was dated February 24, 2006, and did not differ in any significant way from the final report that was dated March 8, 2006.

Therefore, the Court concludes that there was not any prejudice in the Plaintiffs' failure to produce the draft reports of its experts. Even if there were, however, the Court believes that the cross examination that such evidence would provide is of limited probative value, especially in the bench trial held in this case. *See, e.g., Bogosian,* 738 F.2d at 595.

c. *Appropriateness of Lesser Sanction*

In this case, the Court is not convinced that every draft of the experts' reports would have been useful in understanding the experts' opinions or in cross examining them. On balance the Court concludes that the extreme sanction sought by the Defendants is not warranted. The Court, therefore, concludes that the lesser sanction imposed by it of production of additional notes and documents by the Plaintiffs and their counsel was a sufficient sanction for the violation of the Rules to the extent one was committed by the Plaintiffs and their experts.

B. *Sanctions for Discovery Misconduct*

1. *Bad Faith, Wilfulness or Fault*

 In its decision, the Third Circuit stated that "[w]e do note that preventing a party from asserting the attorney-client privilege is a legitimate sanction for abusing the discovery process, and we do not foreclose that remedy on remand. Disclosure is a serious sanction, but one that may be imposed only if the ... Court finds bad faith, wilfulness, or fault." *Teleglobe,*

493 F.3d at 386 *(citing Am. Nat'l Bank & Trust Co. of Chicago v. Equitable Life Assurance Soc'y of the U.S.,* 406 F.3d 867, 877 (7th Cir.2005)). See *also Langley v. Union Elec. Co.,* 107 F.3d 510, 514 (7th Cir.1997) ("[Discovery] sanctions may only be imposed where a party displays wilfulness, bad faith, or fault.' ") (citation omitted).

The Plaintiffs note that the standard for imposing the sanction of required disclosure is in the disjunctive; that is, they need show only that the Defendants displayed one of the categories of offending conduct. *See, e.g., Marrocco v. Gen. Motors Corp.,* 966 F.2d 220, 224 (7th Cir.1992) (stating that each prong of the test is "wholly distinct from" the others and the presence of any of the three can justify sanctions).

a. *Bad Faith or Wilfulness*

 Bad faith is "conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order." *Marrocco,* 966 F.2d at 224. Wilfulness is found where a party has engaged in a "pattern of conduct" in "flagrant disregard" of the rules of discovery and a specific court order. *DiGregorio v. First Rediscount Corp.,* 506 F.2d 781, 788 (3d Cir.1974). Both of those prongs therefore require a finding that the Defendants failed to comply with a court order directing production.

 The Plaintiffs argue that the Defendants in effect did fail to comply with this Court's order requiring production under Rule 2004 because at that time the Defendants represented to the Court that they would produce all documents involved in a joint representation of Teleglobe and BCE. This was reiterated in the Defendants' response to the Motion to Compel. Notwithstanding those representations, the Plaintiffs contend that the Defendants

have not in fact produced those documents but now claim they are privileged.

The Court is not prepared to find that the Defendants have not complied with its Rule 2004 Order, however, because as the Third Circuit noted, there was a serious difference in understanding between the parties as to what the joint representation was. *Teleglobe*, 493 F.3d at 378 (concluding that the Defendants had not waived the privilege by agreeing to produce documents sought in the Rule 2004 Motion because "it appears that BCE agreed to produce documents that fell within its understanding of the BCE/Teleglobe joint representation, not the masses of documents that [the Plaintiffs sought and] the Special Master eventually found to fall within that category.").

### b. *Fault*

 Relying on the "fault" element, the Plaintiffs argue that the Court should order the turnover of all of the documents at issue as a sanction for the Defendants' over-designation of privileged documents. The Plaintiffs argue that "fault" does not concern "the non-complying party's subjective motivation, but rather 'only describe[s] the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation.'" *Langley*, 107 F.3d at 514. The Plaintiffs argue that the Defendants' conduct with respect to their privilege logs was at fault because it was unreasonable. In support of this conclusion, the Plaintiffs point to the Defendants' over-designation of almost 33,000 pages of documents, which the Defendant changed only when the Special Master threatened an in camera review of them. In addition, the Plaintiffs note that the Defendants continually updated, undesignated, and reclassified documents throughout the course of this litigation and the discovery dispute. By wrongfully designating thousands of pages of documents as privileged in the first place, the Plaintiffs argue that the Defendants deprived the Plaintiffs of the opportunity to conduct thorough depositions, delayed the course of this litigation by more than a year, and cost the Plaintiffs thousands of dollars in pursuing the Motion to Compel. The Plaintiffs contend that this course of conduct was not reasonable and seriously prejudiced them. Therefore, the Plaintiffs argue that the Court should compel the turnover of all of the remaining documents on the Defendants' privilege log.

The Defendants respond that a sanction mandating disclosure of all privileged documents is not appropriate in this case. First, the Defendants contend that the Plaintiffs have failed to prove any improper intent—bad faith, wilfulness, or fault-in the Defendants' over-designation of privileged documents. Specifically, they note that the Plaintiffs presented no testimony on this issue, except the affidavits of Chad Shandler who had no personal knowledge of the Defendants' intent and stated only what documents were undesignated. Therefore, the Defendants argue that the Plaintiffs rely simply on inferences of fault from the timing and number of undesignated documents. This they contend is insufficient.

In rebuttal, the Defendants presented the declaration of Jaculin Aaron to explain in detail the procedure used by the Defendants' counsel in reviewing the more than 900,000 documents subject to production. The Defendants admit that mistakes were made but contend that they were "honest" mistakes occasioned by the breadth of the discovery requests and the extensive amount of work required of counsel in this litigation. Further, the Defendants assert that when mistakes were discovered, they were corrected and the documents were produced. *See, e.g., Am. Nat'l Bank*, 406 F.3d at 879 (overturning sanction where

party conceded need to revise its initial privilege log, volunteered an amended log, cooperated with opposing party to try to resolve the discovery dispute, and promptly complied with the magistrate's order for production). Thus, the Defendants argue that the over-designation does not meet the standard of intent required for imposition of drastic discovery sanctions.

The Court agrees with the Defendants that the Plaintiffs have failed to prove that the Defendants' conduct in discovery constitutes "fault" mandating the production of all privileged documents. During the course of this litigation, the Defendants have produced over 900,000 pages of documents. The Defendants originally designated 33,000 documents as privileged which on further review (and as the issues regarding joint representation became more focused) were produced. In complex litigation it is not unusual for counsel to claim privilege initially as to many documents which on further review are not covered and have to be produced. *Am. Nat'l Bank,* 406 F.3d at 878–79 ("[I]t is expected that clients and their attorneys will 'zealously' protect documents believed, in good faith, to be within the scope of the privilege.").

This is "an area of privilege law that is generally recognized to be 'especially difficult,' namely, distinguishing in-house counsels' legal advice from their business advice." *Id.* at 879. In this case that difficulty was compounded by the issue of which client held the privilege and whether there was a joint representation of BCE and Teleglobe or BCE, Teleglobe and the Debtors. Its complexity is highlighted by the fact that the Third Circuit devoted almost 20 pages to its discussion of this issue. *Teleglobe,* 493 F.3d at 359–74, 378–83.

Therefore, the Court is not surprised that the Defendants had to review their privilege log continually to ascertain whether the documents were privileged. Further, the Court is convinced that the Defendants acted promptly in reviewing the privilege log and producing documents when it was determined that the privilege did not apply. The Court does not find that such conduct rises to the level of "fault" meriting the ultimate sanction of mandated production of all privileged documents.

### c. *Prejudice*

In addition, the Defendants argue that any over-designation of documents caused no prejudice to the Plaintiffs. The Defendants note that the Plaintiffs have admitted that most of the withheld documents were only "marginally relevant" to the litigation. In fact, of the 1062 trial exhibits designated by the Plaintiffs, only 48 are documents which were originally designated as privileged by the Defendants (20 of which the Defendants contend are duplicates or similar to other documents already produced). The Defendants note that although the Plaintiffs claim prejudice in not having these documents available at the depositions, the Plaintiffs have not asked to re-depose a single person. The Defendants also contend that any cost and delay in this litigation was not all attributable to their discovery conduct. They note that the Plaintiffs also caused much delay and additional costs in their discovery conduct. All of this was due to the complex nature of the underlying dispute.

Furthermore, the Defendants contend that, even if some delay and cost is attributable to the Defendants' conduct, it could be addressed by measures far less severe than mandated disclosure of all privileged documents. *See, e.g., Crown Life Ins. Co. v. Craig,* 995 F.2d 1376, 1382 (7th Cir.1993) ("[ A]n award of sanctions must be proportionate to the circumstances surrounding

the failure to comply with discovery."). The Defendants contend that a monetary sanction, as opposed to the drastic sanction of waiver of the attorney-client privilege, is more proportionate to the harm caused by any conduct of the Defendants.

The Court agrees that, even if the Defendants were at fault in their discovery conduct, the remedy should be limited to monetary sanctions. This case is far from being ready for trial; any prejudice to the Plaintiffs from not having all documents during depositions can be remedied by additional depositions limited to examination about recently produced documents. The Defendants have already been assessed the costs of the Special Master. The Court is not convinced that any additional remedy would be appropriate under the circumstances of this case.

### 2. Waiver of Privilege

The Plaintiffs argue, however, that they should now have access to privileged documents because the Defendants waived the privilege when their witnesses testified at the December hearings and referred to the privileged documents.

#### a. Turcotte Testimony

The Plaintiffs contend that the Defendants waived the privilege with respect to certain communications involving Martine Turcotte, BCE's Chief Legal Officer, when they called her to testify at the hearings held in December. The Plaintiffs contend that this constitutes an "at issue" waiver of privilege because it placed at issue the subject matter of the privileged communications. See, e.g., Tackett v. State Farm Fire & Cas. Ins. Co., 653 A.2d 254, 259 (Del.1995) ("The courts of this State have refused to allow a party to make bare, factual allegations, the veracity of which are central to resolution of the parties' dispute, and then assert the attorney-client privilege as a bar-

rier to prevent a full understanding of the facts disclosed."). The Plaintiffs contend that there were numerous matters about which Turcotte offered factual testimony that implicated advice given by her or other counsel purporting to act for BCE. (See B.Ct. Adv. D.I. 116 at 447, 453, 460, 466, 473, 479–80, 488–89, 495, 504, 506–07, 509–10.) The Plaintiffs argue that they were unable to cross-examine Turcotte effectively on these points without the privileged documents.

The Defendants respond preliminarily that the Third Circuit cautioned in this case that "[i]n discovery disputes, implied waivers are construed narrowly." Teleglobe, 493 F.3d at 378. The Defendants argue that they have not put the legal advice of BCE's attorneys at issue as evidenced by the fact that they have fought the production of the privileged documents for years through appeal to the Third Circuit and remand to this Court.

The Defendants further dispute the Plaintiffs' contention that Turcotte's testimony put at issue the subject matter of the privileged documents. Rather, they argue that none of the factual statements made by Turcotte relied on or disclosed privileged legal advice given to BCE. Instead, they contend that the testimony of Turcotte dealt with facts as she knew them or believed them to be, primarily related to business issues (e.g., whether anyone from the Debtors or Teleglobe told her that BCE was obligated to fund Teleglobe or whether BCE would cease funding Teleglobe).

The Court agrees with the Defendants. The Third Circuit explained:

> In discovery disputes, implied waivers are construed narrowly, In re Lott, 424 F.3d 446, 453 (6th Cir.2005), and a party is only forced to produce documents under a prospective waiver theory if it

agrees to disclose only favorable privileged documents while keeping for itself the unfavorable ones to gain an advantage in litigation. *See Westinghouse [Elec. Corp. v. Republic of Philippines]*, 951 F.2d [1414] at 1426 n. 12 [(3d Cir. 1991)] ("When a party discloses a portion of otherwise privileged materials while withholding the rest, the privilege is waived only as to those communications actually disclosed, unless a partial waiver would be unfair to the party's adversary. If partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject."); *accord Tackett*, 653 A.2d at 260 (holding that Delaware courts will only find a prospective waiver when a party uses partial disclosure as a weapon).

*Teleglobe*, 493 F.3d at 378.

■ Because of the importance of the attorney-client privilege, "at issue" waiver is narrowly construed and applies only "where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Rhone–Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir.1994). Simply because the information is relevant to the testimony does not mean the privilege has been waived. *See, e.g., In re Sutton*, C.A. No. 96M–08–024, 1996 WL 659002, at *9 (Del.Super.Ct. Aug.30, 1996) (waiver of privileged information cannot be justified "merely to provide the opposing party information helpful to its cross-examination or because information is relevant.") *(quoting Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408, 415–16 (D.Del. 1992)); *E.I. DuPont de Nemours & Co. v. Admiral Ins. Co.*, No. 89C–Au–99, 1994

WL 89447, at *3 (Del.Super.Ct. Feb.15, 1994).

■ In this case, the Court finds that none of the testimony of Turcotte disclosed legal advice given to BCE or the content of any of the privileged documents. Although her testimony and the documents may have related to the same subject matter (e.g., Project X), the Court does not find that Turcotte's testimony sought to use the privileged documents as a sword while keeping other information hidden behind the shield of the attorney-client privilege. Rather, her testimony was of her actions and her beliefs and did not refer specifically to the contents of any of the alleged privileged documents. Accordingly, the Court finds that the "at issue" waiver is not applicable here.

b. *Shapiro Testimony*

■ The Plaintiffs also argue that the Defendants have waived the privilege because the Defendants used privileged documents to refresh the recollection of Mark Shapiro in preparation for his testimony at the December hearings. The Plaintiffs contend that after reviewing those documents, Shapiro testified about the extent of the representation of BCE by Shearman & Sterling LLP ("Shearman") and specifically about documents which the Special Master found evidenced that Shearman represented Teleglobe as well as BCE.

The Plaintiffs contend that, because Shapiro looked at the documents to refresh his recollection prior to testifying, the Defendants must produce those documents pursuant to Rule 612 of the Federal Rules of Evidence. *See, e.g., James Julian, Inc. v. Raytheon Co.*, 93 F.R.D. 138, 145 (D.Del.1982) (concluding that using privileged documents to refresh a witness's recollection constituted waiver of the privilege). *Accord S & A Painting Co., Inc. v. O.W.B. Corp.*, 103 F.R.D. 407, 409

(W.D.Pa.1984); *Wheeling–Pittsburgh Steel Corp. v. Underwriters Labs., Inc.*, 81 F.R.D. 8, 9 (N.D.Ill.1978).

The Defendants argue that Rule 612 does not mandate production, but is subject to the Court's discretion. They also note that the advisory committee note to the Rule expressly states that "nothing in the Rule [should] be considered as barring the assertion of a privilege with respect to writings used by a witness to refresh his memory." Fed.R.Evid. 612 advisory committee's note. The Defendants assert that this is especially true where an attorney is reviewing documents to establish their privileged nature. The Defendants contend that the Plaintiffs' suggestion that Shapiro could not review the documents in question in preparation for testifying at the hearing on the issue of whether those documents are protected by the attorney-client privilege is ludicrous.

[redacted] The Court agrees with the Defendants that the review of the documents at issue by Shapiro did not waive the attorney-client privilege. By its very terms, Rule 612 commits any disclosure requirement to the Court's discretion. Rule 612 provides, in relevant part, that

> if a witness uses a writing to refresh memory ... before testifying, *if the court in its discretion* determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.

Fed.R.Evid. 612 (emphasis added).

[redacted] "In applying Rule 612, courts must balance the tension between the disclosure needed for effective cross-examination and the protection against disclosure afforded by any relevant privilege." *Suss v. MSX Int'l Eng'g Servs., Inc.*, 212 F.R.D. 159, 163 (S.D.N.Y.2002) (concluding that "[t]he privilege would not be lost" where an attorney "review[s] his own already privileged documents.").

In this case, Shapiro was testifying about the nature and scope of Shearman's representation and whether documents prepared by him and Shearman were for BCE alone or for Teleglobe or the Debtors. Shapiro was an attorney retained by BCE, refreshing his memory years later on the details of his representation for that client in the context of a discovery dispute over privileged communications drafted by him. It would be unreasonable to expect him to testify without first reviewing the documents at issue. Therefore, the Court will exercise its discretion in favor of nondisclosure. *See, e.g., Julian*, 93 F.R.D. at 146 ("Each case [under Rule 612] must, of course, be evaluated on its own facts. In a given case the fact that the privileged documents contained attorneys' mental impressions might cause the Court to strike the balance in favor of nondisclosure.") To do otherwise would defeat the purpose of the discovery-related litigation.

The Court noted at the December hearings, however, that the issue of whether the documents establish that Shearman did in fact represent Teleglobe (and/or the Debtors) as the Special Master found or that Shearman only represented BCE as Shapiro testified required an in camera review of the privileged documents considered by the Special Master on this point. (Hr'g Tr. 148:21–150:6, Dec. 14, 2007.) Therefore, the Court did review those documents and, as noted below, concludes that they do support the testimony of Shapiro rather than the conclusion of the Special Master.

C. *Co–Client Privilege*

[redacted] The Plaintiffs claim that the Debtors were jointly represented with BCE

with respect to the decision to stop funding Teleglobe, which BCE dubbed Project X. As a result, the Plaintiffs contend that the "adverse litigation exception" to the privilege rule applies and requires the turnover to them of all privileged documents relating to that decision. "When former co-clients sue one another, the default rule is that all communications made in the course of the joint representation are discoverable." *Teleglobe*, 493 F.3d at 366 *(citing* Restatement (Third) of the Law Governing Lawyers § 75(2)(2008)).[8]

■ An attorney-client relationship arises when the client manifests "intent that the lawyer provide legal services for the [entity]" and the lawyer "manifests consent to do so" or fails to "manifest lack of consent." Restatement (Third) of the Law Governing Lawyers § 14 (2000). "The client's intent may be manifest from surrounding facts and circumstances. . . . No written contract is required. . . ." *Id.* "When the client is a corporation . . . whether the lawyer is to represent the organization . . . or more than one such persons and entities is a question of fact to be determined based on reasonable expectations in the circumstances." *Id.* cmt. f.

The Plaintiffs contend that the joint representation is evidenced by (1) the findings of the Special Master as to what the withheld documents indicate; (2) facts showing the express representation of the Debtors by BCE's in-house and outside counsel; and (3) facts evidencing that there was an implied representation of the Debtors by BCE's in-house and outside counsel. The

Defendants argue that the facts do not support the Plaintiffs' assertions.[9]

### 1. *Law of the Case*

The Plaintiffs argue that the findings of the Special Master which were affirmed by the District Court are the law of the case, to the extent they were not disturbed by the Third Circuit. The Defendants assert that all relevant findings by the Special Master have been disavowed by the Third Circuit with instructions on remand for this Court to determine whether a joint representation between BCE and the Debtors existed. *Teleglobe*, 493 F.3d at 380.

■ The Court disagrees with the Plaintiffs' argument. The law of the case doctrine is discretionary and applies, if at all, only to a ruling on a point of law. *See Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 988 F.2d 414, 429 (3d Cir. 1993). Thus, the Special Master's factual findings, as adopted by the District Court, cannot be the law of the case.

Further, the Third Circuit expressly determined that the District Court had not made the requisite factual finding of a joint representation of BCE and the Debtors necessary for production of the documents. *Teleglobe*, 493 F.3d at 380 ("Ordering the production of documents on the privilege log must be predicated on a factual finding that BCE and the Debtors were parties to a joint representation. Because there is no such finding on record,

---

8. The Third Circuit rejected the Defendants' argument that where the joint clients are parent and subsidiaries, the default rule should be that all communications generated in the course of the joint representation are not discoverable in adverse litigation. *Id.* at 368. The Third Circuit predicted that the Delaware Courts would apply the adverse litigation ex-

ception in all situations, even where the joint clients were a parent and its subsidiaries. *Id.*

9. The Third Circuit concluded, contrary to the Special Master, that BCE had not waived its argument that it and the Debtors were not jointly represented by BCE's counsel on a matter relating to this case. *Teleglobe*, 493 F.3d at 377.

we remand for further factfinding on this issue.")

In addition, the Third Circuit's decision undermined the legal basis for the District Court's and Special Master's findings in several respects. First, the Third Circuit held that the Special Master's finding of a joint representation of BCE and Teleglobe was not sufficient to warrant production of the documents to the Plaintiffs because such documents are protected by the attorney-client privilege from disclosure to third parties and one party cannot waive that privilege. The Third Circuit explained that:

> When co-clients and their common attorneys communicate with one another, those communications are "in confidence" for privilege purposes. Hence the privilege protects those communications from compelled disclosure to persons outside the joint representation. Moreover, waiving the joint-client privilege requires the consent of all joint clients. Restatement (Third) of the Law Governing Lawyers § 75(2). A wrinkle here is that a client may unilaterally waive the privilege as to its own communications with a joint attorney, so long as those communications concern only the waiving client; it may not, however, unilaterally waive the privilege as to any of the other joint clients' communications or as to any of its communications that relate to other joint clients.

*Teleglobe*, 493 F.3d at 363. Thus, even though the Special Master found that Teleglobe had waived the attorney-client privilege in favor of the Debtors in its CCCAA plan, that is not effective because BCE did not consent to the waiver.

Even if there were a joint representation of BCE and the Debtors, the Third Circuit firmly rejected the broad scope of the joint representation articulated by the Special Master. The Third Circuit stated that the broader rule would permit, in the context of adverse litigation, a former subsidiary to access all of its former parent's privileged communications because, as a matter of law, the subsidiary would be within the parent's community of interests. *Id.* at 379. Instead, the Third Circuit stated that "joint representation only arises when common attorneys are affirmatively doing legal work for both entities on a matter of common interest." *Id.* The Third Circuit's more narrow rule ensures that, unless there is affirmative representation on a common legal interest, sharing of information would not eviscerate the attorney-client privilege. *Id.* at 369.

▇▇▇ Therefore, this Court must find that BCE and the Debtors were jointly represented by counsel on a matter of common interest relating to the specific issue that is addressed in the withheld documents for the Debtors to be able to gain access to those documents.

### 2. *Express Representation*

▇▇▇ The Plaintiffs argue that with respect to the decisions on the restructuring and continued funding of Teleglobe, BCE's in-house and outside counsel jointly represented BCE, Teleglobe and the Debtors. This is evidenced, they argue, by the fact that the only attorneys doing work on those issues were BCE's attorneys. For example, they note that BCE's in-house counsel negotiated the extension of the bank line of credit to Teleglobe, on which Debtor Teleglobe Holdings (U.S.) Corp. was a guarantor.

The Defendants respond that there is absolutely no evidence that the Debtors asked any of the BCE attorneys to represent them with respect to anything. They further note that all the evidence refutes the Plaintiffs' assertions. Both Turcotte and Shapiro testified that they never rep-

resented the Debtors and only represented BCE. While the communications between BCE and its counsel with respect to continuing to fund Teleglobe may have referenced or indirectly affected the Debtors, the Defendants contend that at no time were BCE's attorneys representing anyone other than BCE. Simply because Teleglobe, and possibly the Debtors, were the subjects of communications between BCE and its attorneys does not mean that they were clients of BCE's attorneys.

The Court agrees with the Defendants that the facts do not support the Plaintiffs' argument. At the hearings held before this Court in December 2007, the Plaintiffs presented no evidence to demonstrate that the Debtors expressly conveyed their desire for, or consent to, representation by any counsel for BCE. There was no engagement letter from any counsel to BCE and the Debtors jointly. BCE and the Debtors had separate in-house legal staff; the Debtors' in-house legal staff handled all of their operational legal matters.

The fact that only BCE's attorneys were considering the possible restructuring and funding needs of Teleglobe does not mean that they were representing the Debtors' interests as well. In fact, the Court finds that there was no common interest between BCE (the potential provider or guarantor of the funds) and the Debtors (the indirect recipient of the funds). Thus, the Court concludes that there was no explicit joint representation of BCE and the Debtors by counsel for BCE relating to BCE's decision to fund or not fund Teleglobe.

### a. Single Enterprise

The Plaintiffs assert that there was evidence of a direct representation of the Debtors and BCE by BCE's in-house and outside counsel because BCE treated Teleglobe and the Debtors as a single enterprise. As a result, the Plaintiffs argue

that where BCE's counsel represented Teleglobe they also represented the Debtors.

The Court rejects the Plaintiffs' argument. The Third Circuit cautioned that "absent some compelling reason to disregard entity separateness, in the typical case courts should treat the various members of the corporate group as the separate corporations they are and not as one client." *Teleglobe*, 493 F.3d at 372.

In this case the facts show that there was not a single enterprise for purposes of attorney-client representation. Each of the Debtors, Teleglobe and BCE are separate corporations. Teleglobe and BCE are Canadian corporations; the Debtors are U.S. corporations. Many of the Debtors were in businesses that did not involve Teleglobe's GlobeSystem; many Teleglobe subsidiaries other than the Debtors were involved in the GlobeSystem.

It is true that upon its acquisition of Teleglobe, BCE had its in-house legal department handle some matters for Teleglobe on an ad hoc basis (securities compliance, capital markets, and mergers and acquisitions). That did not, however, mean that BCE was handling those matters for the Debtors. In fact, the Debtors had their own in-house and outside counsel who handled their legal matters. Even the Plaintiffs' representative, Kathleen Morgan, who had been an in-house counsel with the Debtors, verified that the Debtors' in-house legal group handled the Debtors' own legal matters, especially relating to corporate governance and operational matters. Morgan (and the general counsel for the Debtors, John Brunette) testified that the Debtors' in-house counsel did not report to BCE or Teleglobe, had authority to independently hire outside

counsel, and did not seek BCE's approval of their legal budget.

The Plaintiffs assert, however, that evidence proving that the Debtors, Teleglobe and BCE were a single enterprise is found in the functioning of their boards of directors. They note that many of the board members of Teleglobe and BCE were also board members of the Debtors and that there is no evidence that the Debtors' boards ever met for an official, documented board meeting. Thus, they assert that the Teleglobe and BCE boards acted as the de facto board of the Debtors, thereby establishing they were a single enterprise.

The Defendants respond that the Debtors' boards functioned through their management teams which were in constant communication with each other and, therefore, there was no need to convene formal board meetings. They further note that the Debtors' boards executed written resolutions in lieu of board meetings in accordance with the dictates of Delaware law.

The Court concludes that the facts do not support the Plaintiffs' contention. Only a small number of the thirty-plus officers or directors of the Debtors were also employees, officers, or directors of Teleglobe or BCE. The Court concludes that the mere overlap of a few directors or officers, without more, does not present a "compelling reason to disregard entity separateness" and treat the entities as a single enterprise. *Id.* at 372.

Further, there is no evidence that BCE's or Teleglobe's board met and made decisions for the Debtors. The absence of board meetings by the Debtors is not evidence that the BCE or Teleglobe board acted on their behalf, but rather reflects the management team style the Debtors' boards utilized. Under Delaware Law, "any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing." 8 Del. C. § 141(f) (1996). *See also Bowers v. Columbia Gen. Corp.,* 336 F.Supp. 609, 614 (D.Del.1971) (holding that corporate action without a formal directors' meeting was proper under 8 Del.C. 141(f) where the requisite consent form is signed by all directors). As a result, the Court finds that the Debtors' failure to hold official board meetings does not mean that the board meetings held by BCE or Teleglobe were also meetings of the Debtors' board.

3. *Waiver*

The Plaintiffs contend, however, that the attorney-client privilege was waived because the overlapping board members of the Debtors attended Project X meetings where legal advice was given to BCE. The Plaintiffs argue that in the absence of an explicit statement that the legal advice was meant for the overlapping board members only in their capacity as BCE representatives, the disclosure to them constitutes a waiver and/or demonstrates a co-client relationship between BCE and the Debtors relating to Project X.

The Defendants respond that the overlapping board members understood that Project X involved legal issues discrete to BCE and in receiving that advice were acting as representatives of BCE, not the Debtors. Therefore, the Defendants contend that the mere fact that the board members were overlapping did not constitute a waiver of the attorney-client privilege. *See, e.g., In re Fuqua Indus., Inc. S'holders Litig.,* No. Civ. A.11974, 1999 WL 959182, at *2 (Del.Ch. Sept.17, 1999) (holding that the presence of several directors on the boards of two corporations does not waive the attorney-client privilege because doing so would have "disastrous

effects on cross-directorships," providing the example where a director sitting on multiple boards would be constantly excusing herself in an attempt to preserve privilege on certain documents).

The Court agrees with the Defendants. The attendance at BCE or Teleglobe board meetings by directors who were also directors or officers of the Debtors did not constitute a waiver of the attorney-client privilege. *Teleglobe*, 493 F.3d at 372 (holding that "it does not break confidence to share an attorney-parent communication with an officer of the parent in her capacity as officer of the parent, even though she is also a director or officer of a subsidiary.").

### 4. Implied Joint Representation

■ The Plaintiffs argue nonetheless that there was an implied joint representation because they shared a common legal interest with Teleglobe and BCE in several areas. The Third Circuit acknowledged that "nothing prevents joint representations from arising by implication" but cautioned that "courts must be careful not to imply joint representation too readily." *Teleglobe*, 493 F.3d at 362. The Third Circuit held that the joint client privilege must be narrowly drawn to include only those communications as to which the related companies have a community of interest because "even in the parent-subsidiary context a joint representation only arises when common attorneys are affirmatively doing legal work for both entities on a matter of common interest." *Id.* at 379. The extent of a common legal inter-

est is determined by the parties' intent and the interaction of the lawyers. *Id.* at 363.

#### a. Public Filings

The Plaintiffs argue that the public filings made by BCE and Teleglobe show that there was an implied joint representation of the Debtors by counsel for BCE. Specifically, they argue that counsel for BCE had to communicate with the Debtors to obtain information necessary for those filings (including the Debtors' financial results). They argue that this evidences a joint representation.

The Court disagrees with the Plaintiffs' contentions. The Debtors were not required to make any public filings because they had no public debt or equity; therefore they needed no legal representation with respect to those filings. It was only Teleglobe and BCE, as public companies, that were required to make public filings, not the Debtors. Although BCE's counsel communicated with the Debtors with respect to those filings, it was as counsel for BCE (and possibly Teleglobe) to assure that the necessary information was accurate and included in the filings. Therefore, the Court finds that there was not a joint representation of the Debtors relating to the public filings made by Teleglobe.[10]

#### b. Retention of Advisors

The Defendants argue that the lack of a joint representation is evidenced by the fact that when BCE recognized the potential for a divergence of interest between it and Teleglobe, separate advisors were re-

---

**10.** Even if there was a joint representation of the Debtors by BCE's counsel with respect to the public filings, the scope of that representation would be limited. In this regard, the Third Circuit stated that:

> When, for example, in-house counsel of the parent seek information from various subsidiaries in order to complete the necessary

> public filings, the scope of the joint representation is typically limited to making those filings correctly. It does not usually involve jointly representing the various corporations on the substance of everything that underlies those filings.

*Teleglobe*, 493 F.3d at 372–73.

tained for Teleglobe. The Plaintiffs contend, instead, that the retention of those advisors proves that BCE's counsel was representing the Debtors as well as BCE, especially with respect to Project X.

#### i. *Davies Ward*

On April 8, 2002, BCE determined that Davies Ward, which had previously represented it, should represent Teleglobe. Davies Ward ceased representing Teleglobe on April 17, 2002, within a short period of being engaged, when BCE decided it should continue representing BCE on other matters. During the time it purported to represent Teleglobe, Davies Ward continued to represent BCE in connection with Project X. The Plaintiffs argue that Davies Ward was clearly representing both BCE and Teleglobe on Project X at the same time, thereby triggering the adverse litigation exception and mandating the turnover of all Project X documents to the Plaintiffs.

The Court disagrees. The Third Circuit noted that "when an attorney (improperly) represents two clients whose interests are adverse, the communications are privileged against each other notwithstanding the lawyer's misconduct." *Teleglobe*, 493 F.3d at 368 *(citing Eureka Inv. Corp. v. Chicago Title Ins. Co.*, 743 F.2d 932, 937–38 (D.C.Cir.1984) (holding that the scope of the joint-client relationship, as intended by the parties, determines the scope of the attorney client-privilege, and clients should not be deprived of this privilege solely because of the lawyer's misconduct)). Consequently, the Court concludes that even if Davies Ward was improperly representing BCE and Teleglobe, there is no clear evidence that both parties intended Davies Ward to represent them jointly with respect to Project X.

The Court finds convincing the testimony of both Brunette and Turcotte that the parties did not intend this. Not only did Brunette confirm that he intended no joint representation of the Debtors with BCE, but he went so far as to warn the Debtors not to view BCE's legal counsel as their own. Turcotte also testified that it was BCE's intention to receive separate legal advice regarding Project X and specifically BCE's own legal exposure in the event it decided to cease funding Teleglobe.

Further, any joint representation by Davies Ward of Teleglobe and BCE does not extend to the Debtors, without any evidence of an express representation of the Debtors by Davies Ward. No evidence was presented by the Plaintiffs to this effect. Consequently, the Court concludes that the adverse litigation exception is not implicated by the retention of Davies Ward.

#### ii. *Shearman and Stikeman*

In late March and early April, BCE retained Shearman & Sterling ("Shearman") and Stikeman Elliot ("Stikeman") to analyze BCE's legal exposure should it decide to stop funding Teleglobe. Because BCE's attorneys met with and communicated with Teleglobe and the Debtors about Project X, the Plaintiffs argue that they were co-clients of Shearman and Stikeman. They note specifically the findings by the Special Master that two memos prepared by Shearman were addressed to Teleglobe and discussed issues that might arise in the event that Teleglobe and/or the Debtors filed bankruptcy.

The Court concludes that Shearman and Stikeman were representing BCE alone. A review of the memos in question reveals that although they contained information *about* the Debtors, they did not appear to convey legal advice to the Debtors. Further, Shapiro testified that they were *not delivered* to the Debtors but were provided only to BCE and constituted legal advice given to BCE alone. In fact, Shapiro testified unequivocally that his firm represent-

ed only BCE, not Teleglobe or the Debtors; their work product (and their bills) were given only to BCE. Therefore, the Court concludes that the Debtors were not the intended recipients of the legal advice contained in the memos and were not represented by Shearman or Stikeman. Thus, on the evidence presented, the Court concludes there was no attorney-client relationship between the Debtors and Shearman or Stikeman.

### iii. *Lazard and Ernst & Young*

Similarly, the Plaintiffs argue that BCE's involvement in the engagement of Ernst & Young ("E & Y") and Lazard Freres & Co., LLC ("Lazard") as advisors for the Debtors and/or Teleglobe relating to Project X proves that there was a co-client relationship between BCE and the Debtors. The Plaintiffs note that Turcotte wrote the engagement letter for Lazard and negotiated the terms of the E & Y retention. Further, the Plaintiffs point to the fact that BCE was authorized to view any of Lazard's or E & Y's work-product. The Plaintiffs contend that this is evidence of the common legal interest (and thus co-client relationship) among BCE, Teleglobe and the Debtors in Project X.

The Defendants respond that Turcotte's role in the engagement of Lazard and E & Y was discrete and minimal and does not evidence a joint representation. Although Turcotte drafted the engagement letters, they were in fact executed by representatives of the Debtors and/or Teleglobe. Further, the Defendants note that although the Debtors and/or Teleglobe could disclose their advisors' work product to BCE, BCE could not demand disclosure.

The Court agrees with the Defendants that the involvement of BCE in the retention of Lazard and E & Y by Teleglobe did not create or evidence a co-client relationship between BCE and the Debtors. Turcotte's involvement in drafting the engage-

ment letters was ministerial. The letters and actions of the parties make it clear the advisors were representing the Debtors and/or Teleglobe only. Although some of Lazard's conclusions were shared with BCE, that was natural because BCE was the ultimate parent and a logical source of funding of any reorganization effort.

### c. *Project X*

The Plaintiffs argue nonetheless that the interaction between BCE's legal counsel and the Debtors with respect to Project X created a co-client relationship. The Plaintiffs argue that the Debtors had a significant and direct common interest with Teleglobe and BCE regarding the continued BCE funding and viability of Teleglobe because they had no other source of funding. This, they argue, created a common interest with Teleglobe and BCE in the issues addressed by counsel in connection with Project X.

The Defendants disagree. They contend that Project X was an undertaking by BCE to identify a viable business plan for Teleglobe so that BCE could make an informed business decision relating to its continued funding of Teleglobe. They argue that Project X also addressed the legal exposure BCE would face should it cease funding Teleglobe. Consequently, BCE argues that the Debtors shared no common interest in Project X with BCE.

Overall, the actions of the parties and their legal and other representatives demonstrate that the parties did not intend a co-client relationship between BCE and the Debtors in connection with Project X. Rather than a common interest with Teleglobe and the Debtors, BCE's interest in whether to continue to fund Teleglobe was not aligned with Teleglobe or the Debtors. Consequently, the Court concludes that the parties did not share a common interest with respect to Project X and those

communications are protected under the attorney-client privilege.

The Plaintiffs contend, however, that BCE waited "until late in the game" to clarify who was representing whom and on what subject matter. Consequently, the Plaintiffs claim the Debtors relied on BCE's legal counsel to act as their counsel as well during Project X meetings.

The Court finds that any "implication" that BCE's counsel were representing the interests of the Debtors during Project X is refuted by the evidence. Both Turcotte and Shapiro testified categorically that neither was representing the interests of Teleglobe or the Debtors in Project X; they were only representing BCE. Further, Brunette, as general counsel for the Debtors, understood that the Debtors could not rely on BCE's legal counsel as evidenced by the fact that he advised the Debtors' officers "not to speak with BCE lawyers" and "not to disclose confidential information." This is further evidenced by the fact that separate counsel and advisors were hired for Teleglobe and the Debtors.

Thus, the Court concludes that the Debtors did not share a common interest with BCE in connection with Project X and that BCE's attorneys working on that Project were not representing the Debtors' interests. Consequently, the Debtors are not entitled to production of the privileged documents dealing with Project X.

### D. *Fiduciary Exception*

The Plaintiffs maintain nonetheless that the fiduciary exception to the attorney-client privilege applies in this case and warrants production of the documents at issue. *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103–04 (5th Cir.1970). *Garner* evolved as an exception to the attorney-client privilege in the corporate context when "the corporation is in suit against its stockholders on charges of acting inimical-

ly to stockholder interests, [and] protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." *Id.*

The Defendants argue that *Garner* is inapplicable in this case for two principal reasons. First, they argue that the Court should apply Canadian law, which does not recognize the *Garner* exception to the attorney-client privilege. Second, the Defendants assert that even if the Court applies Delaware law, the facts of this case would not warrant application of *Garner.*

### 1. *Canadian Law vs. Delaware Law*

Canadian law does not recognize a fiduciary exception to the attorney-client privilege, while the Delaware courts do. *Compare FCMI Fin. Corp. v. Curtis Int'l Ltd.,* [2003] O.T.C. 1020, [2003] O.J. No. 4713 (declining to apply the "new rule" enunciated in *Garner* based on the Supreme Court of Canada's emphasis that the " 'solicitor-client privilege must be as close to absolute as possible[,]' … will yield only in clearly defined circumstances, and does not involve a balancing of interests on a case by case basis") *with Grimes v. DSC Commc'ns Corp.,* 724 A.2d 561, 568 (Del.Ch.1998) (discussing *Garner* and noting that "[w]hile the attorney-client privilege may be asserted by a corporation that has sought legal advice, 'the privilege is not absolute and an oft-invoked exception applies in suits by minority shareholders.' ") (internal citations omitted). Therefore, the laws of Delaware and Canada are in conflict.

The Defendants contend that application of conflict of laws rules mandates that Canadian law governs this dispute because of Canada's "most significant relationship

with the communication[s]" and special considerations of international comity. Restatement (Second) of Conflict of Laws § 139(2)(1971).

With respect to privileged communications, the Restatement states that:

> (2) Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but *which is not privileged under the local law of the forum will be admitted unless* there is some special reason why the forum policy favoring admission should not be given effect.

Restatement (Second) of Conflict of Laws § 139(2) (emphasis added).

The Defendants cite comments c and d to section 139, which explain the rationale for the Restatement and provide the following factors to be considered in determining which state has the most significant relationship with the communication: "(1) the number and nature of the contacts that the state of the forum has with the parties and with the transaction involved, (2) the relative materiality of the evidence that is sought to be excluded, (3) the kind of privilege involved, and (4) fairness to the parties." *Id.* cmt. d.

Applying those factors, the Defendants argue that Canada has the "most significant relationship" to the communications at issue because BCE is a Canadian corporation and the documents at issue were prepared as a result of BCE's communications with its attorneys. The Defendants contend that the documents in question have no contact with the forum, Delaware. Therefore, they assert that fairness mandates that Canadian law be applied.

The Defendants do not, however, cite any "special reason why the forum policy favoring admission should not be given effect." *Id.* at § 139(2). Their arguments are simply that the documents are privi-

leged under Canadian law. Therefore, the Court concludes that the "default" rule under the Restatement applies here and that the forum's policy (i.e., Delaware law) governs the production of the documents at issue. *Id.*

 Even if the Defendants had established special circumstances suggesting that Canadian law applies, the Plaintiffs argue that Delaware law must be applied because of the internal affairs doctrine. The internal affairs doctrine "governs the choice of law determinations involving matters *peculiar* to corporations, that is, those activities concerning the relationships *inter se* of the corporation, its directors, officers and shareholders" and "requires that the law of the state of incorporation should determine issues relating to internal corporate affairs." *McDermott, Inc. v. Lewis,* 531 A.2d 206, 215 (Del.1987). *See also Teleglobe,* 493 F.3d at 386 *(citing In re Topps Co. S'holders Litig.,* 924 A.2d 951, 960 (Del.Ch.2007)).

 The Court agrees with the Plaintiffs. The issue at hand is undoubtedly one which is peculiar to corporations-a dispute between subsidiaries and parent over certain communications and actions relevant to a suit between them alleging breach of fiduciary duty. The Court concludes that the extent of corporate attorney-client privilege which arises in a case alleging breach of fiduciary duty by officers, directors and the shareholder of a Delaware corporation falls within the ambit of "matters peculiar to corporations." *McDermott,* 531 A.2d at 215. *See also Topps,* 924 A.2d at 960 (explaining that the law of fiduciary obligations is one of the most important ways a state regulates a corporation's internal affairs). Thus, the Court holds that the internal affairs doctrine is applicable and mandates the application of Delaware law to this dispute.

2. *Availability of Garner under Delaware Law*

The Defendants argue, however, that even if Delaware law is applied to this dispute, the Delaware Supreme Court has not and would not apply the *Garner* fiduciary exception in these circumstances. They argue that, by inviting courts to assess factors for overturning privilege, *Garner* is inconsistent with the Supreme Court's admonition that "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Jaffee v. Redmond*, 518 U.S. 1, 18, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) *(quoting Upjohn Co. v. U.S.*, 449 U.S. 383, 393, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)).

The Court rejects the Defendants' argument. *Garner* is not an arbitrary standard that has rarely been applied in Delaware. Rather, the Delaware Courts have found that *Garner* provides a "workable and logical framework for analyzing claims of lawyer-client privilege in the context of shareholder suits" which the "Delaware courts have consistently followed." *Deutsch v. Cogan*, 580 A.2d 100, 105, 106 (Del.Ch.1990).

Though *Garner* has not been expressly adopted by the Delaware Supreme Court, it has been cited and applied with regularity by Delaware courts. See *Zirn v. VLI, Corp.*, 621 A.2d 773, 781–83 (Del.1993) (evaluating "good cause" factors of *Garner* in production dispute); *Ryan v. Gifford*, Civ. A. No. 2213–CC, 2008 WL 43699, at *4 (Del.Ch. Jan.2, 2008); *Ryan v. Gifford*, Civ. A. No. 2213–CC, 2007 WL 4259557, at *3 (Del.Ch. Nov.30, 2007); *Grimes*, 724

A.2d at 568 (discussing the *Garner* fiduciary exception and applying the "good cause" factors of *Garner*).

Further, the Third Circuit predicted that *Garner* would be expanded to apply to a case (such as this one) where an action is brought by a corporation (or its creditors) rather than by minority shareholders, if the corporation is found to be insolvent. The Third Circuit explained that

> BCE, as the ultimate owner of more than half (and, indeed, all) of the Debtors' voting power, owed them the duties of care and loyalty. If the Debtors were solvent, then all duties flowed back up to BCE as the only party with a legitimate interest in the Debtors' success. If that were the case, then BCE is correct that it effectively owed the Debtors no duties. However, if the Debtors were insolvent, then their creditors also had a legitimate interest in their success. With multiple stakeholders, BCE's duties of care and loyalty would come into play in the same way that the directors' duties did in *Garner*, and its attorney-client privilege could be set aside by showing good cause.

*Teleglobe*, 493 F.3d at 386 (internal citations omitted).

Applying the analysis used by the Third Circuit, the Court predicts that the Delaware Supreme Court would adopt the *Garner* doctrine and apply it under these circumstances.[11] *See, e.g., In re Prof'l Ins. Mgmt.*, 130 F.3d 1122, 1125 (3d Cir.1997) ("In interpreting state law, we must predict how the highest court of that state would decide the relevant legal issues.").

---

**11.** The Defendants argue that because it is unclear whether *Garner* should be applied in the instant case, this Court should certify the question of *Garner's* applicability to the Delaware Supreme Court under Rule 41(a)(ii) of the Rules of the Supreme Court of Delaware. That Rule, however, does not permit a Bankruptcy Court to certify a question to the Delaware Supreme Court. See Del. R.S.Ct. 41(a)(ii)(2008).

### 3. *Application of Garner*

To satisfy the requirements of *Garner* as interpreted by the Third Circuit, the Plaintiffs must establish that they were insolvent at the time of the communications in question and that there is "good cause" [12] for the production. *Teleglobe,* 493 F.3d at 386. If the Plaintiffs satisfy these requirements, the fiduciary exception applies and the documents must be produced.

#### a. *Insolvency*

Preliminarily, the Plaintiffs contend that they need make only a colorable showing of insolvency to meet the requirements of *Garner*. The Court disagrees. The Third Circuit held that to avail themselves of the *Garner* exception, the Plaintiffs must prove the Debtors' insolvency. *Teleglobe,* 493 F.3d at 385. If the Debtors were solvent, the fiduciary duties were owed only to the shareholder (i.e., BCE). *Id.* at 386. It is only if the Debtors were insolvent that any duties would be owed to the creditors. *Id.*

Once the Plaintiffs prove insolvency, however, it is true that they need only show that they "have a colorable claim of breach of fiduciary duty to show 'good cause'" for production of the privileged documents. *Id.* at 385. Therefore, the Court concludes that the Plaintiffs must prove that they were insolvent at the relevant time in order to apply the *Garner* exception.

The Plaintiffs seek production of documents reflecting communications which oc-curred between November 2001 and April 2002. The Plaintiffs assert that the Debtors were insolvent throughout the relevant period. The Defendants disagree, maintaining that Teleglobe and the Debtors were solvent until at least April 23, 2002. Until that date, the Defendants argue, Teleglobe and the Debtors were able to pay their debts as they came due with BCE's funding support.

At the evidentiary hearings held on December 11 to 14, 2007, the Plaintiffs presented the testimony of their expert, Paul Charnetzki, who opined that Teleglobe was insolvent during the relevant period. The Defendants presented Joshua Livnat as an expert to rebut Charnetzki's testimony.

The Plaintiffs argue that under Delaware law, a corporation is insolvent when its liabilities exceed its assets or when it is unable to pay its debts as they fall due. *See, e.g., U.S. Bank Nat'l Assn. v. U.S. Timberlands Klamath Falls, L.L.C.,* 864 A.2d 930, 947 (Del.Ch.2004), *vacated on other grounds,* 875 A.2d 632 (Del.2005) ("In Delaware, insolvency is defined in two ways. First, a company is insolvent if it is 'unable to pay its debts as they fall due in the usual course of business.' Second, a company may be insolvent if 'it has liabilities in excess of a reasonable market value of assets held.'") (citations omitted); *Geyer v. Ingersoll Publ'ns Co.,* 621 A.2d 784, 789 (Del.Ch.1992) ("An entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business. That is, an entity is insolvent when it has liabilities in excess of a reasonable market

---

**12.** In order to determine "good cause," the Court should consider the

nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; ... whether the communication related to past or to prospective actions; whether the com-munication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.

*Garner,* 430 F.2d at 1104.

value of assets held.") (internal citation omitted).

In its opinion, the Third Circuit cited a definition of insolvency under the balance sheet test that is more narrow: "a corporation is insolvent if it has: '1) a deficiency of assets below liabilities *with no reasonable prospect that the business can be successfully continued in the face thereof,* or 2) an inability to meet maturing obligations as they fall due in the ordinary course of business.'" *Teleglobe,* 493 F.3d at 384 (emphasis added) *(quoting Production Resources Group, LLC v. NCT Group, Inc.,* 863 A.2d 772, 782 (Del.Ch.2004)).

The Plaintiffs argue that the Third Circuit's addition of the requirement that there be "no reasonable prospect that the business can be successfully continued" adds an unreasonable qualifier to the basic definition of insolvency. The Plaintiffs further contend that the *Production Resources* case is distinguishable because it dealt with the appointment of a receiver which they argue requires a higher standard of insolvency. 863 A.2d at 782.

The Court disagrees. The *Production Resources* Court also addressed the fiduciary duties to creditors that attach "when a firm has reached the point of insolvency." *Id.* at 790–91. The Court applied its definition of insolvency to that situation as well. *Id.* Further, Delaware courts have recognized the *Production Resources* definition of insolvency in situations similar to the instant case. *See, e.g., N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 98 (Del.2007) (evaluating the viability of direct claims for breach of fiduciary duty brought by creditors against directors of a Delaware corporation that is insolvent or in the zone of

insolvency and recognizing the Chancery Court's determination that insolvency "may be demonstrated by either showing (1) 'a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof,' or (2) 'an inability to meet maturing obligations as they fall due in the ordinary course of business.'") (citations omitted).

Consequently, as instructed by the Third Circuit and Delaware case law, this Court will employ the *Production Resources* definition of balance sheet insolvency for purposes of determining if the *Garner* exception applies.

### i. Balance Sheet Test

The Plaintiff's expert, Charnetzki, testified that he applied the balance sheet test and concluded that Teleglobe and the Debtors were insolvent beginning in September 2001. Instead of doing a balance sheet test, however, Charnetzki simply calculated the average of certain investment bankers' assessments of the enterprise value of Teleglobe and compared that to the total amount of Teleglobe's debts.[13] Charnetzki did not even do this much with respect to the Debtors, because there were not any investment bankers' valuations of the Debtors at that time.

Charnetzki further opined that any funding actually provided by BCE, beyond the initial $1 billion authorized in June 2000, had to be ignored because the additional funding was not contractually binding. Based on those assumptions, Charnetzki found that the Debtors' liabilities exceeded the value of their assets and that

13. Charnetzki did not use all of the investment bankers' valuations done at the time, however, because he found some were not reasonable. He also felt all of them were inflated, because they assumed that funding, including that provided by BCE, would be available and assumed that Teleglobe's GlobeSystem would become operational.

they were, therefore, balance sheet insolvent on the dates in question.

The Defendants disagree with Charnetzki's application of the balance sheet test, arguing that he applied the wrong standard of insolvency, relied only on select portions of the investment bankers' analyses (which are hearsay), and erroneously excluded the support of BCE. The Defendants emphasize that BCE was trying to build Teleglobe, and its GlobeSystem, into a major company, was continuing to fund Teleglobe, and was evaluating options (such as joint ventures) to make Teleglobe a successful venture. Therefore, the Defendants argue that the continued support of BCE and the likelihood of success must be considered when evaluating the Debtors' balance sheet. *Cf. Davidoff v. Farina*, No. 04 Civ. 7617(NRB), 2005 WL 2030501, at *11 n. 19 (S.D.N.Y. Aug.22, 2005) (in the context of allegations of securities law violations, noting that "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail").

The Court agrees with the Defendants. Charnetzki did not do a balance sheet analysis himself. Instead, he took selective analyses done by others and "averaged" them without any analysis of their validity. This is not an accepted methodology for performing a balance sheet test. Fed.R.Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."). *See also In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 367, 375 (Bankr.D.Del.2006) (rejecting an expert's "invented [valuation] methodology").

Further, the Court finds that Charnetzki did not consider any valuations of the Debtors' assets (as opposed to Teleglobe's) because none were done at that time. In addition, Charnetzki ignored some valuations of Teleglobe done at the time which he found unfavorable to the Plaintiffs' position. Therefore, the Court concludes that Charnetzki's opinion that the Debtors were insolvent under the balance sheet test is unsupportable.

Even if Charnetzki's testimony were based on accepted methodologies, however, the Court still finds it unconvincing. The Third Circuit instructed that the relevant solvency inquiry with respect to the Debtors' balance sheet is whether the Debtors had "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof." *Teleglobe*, 493 F.3d at 384 *(quoting Production Resources*, 863 A.2d at 782). Under this standard, as long as Teleglobe was actually receiving funding from BCE, there were reasonable prospects that the business of the Debtors could be continued.

Charnetzki acknowledged that, under the "likelihood of success" standard, the Debtors' solvency hinged upon the likelihood that BCE would continue funding. Because BCE's funding was not contractual, however, Charnetzki did not include it as a resource in the balance sheet test. Charnetzki opined that the Debtors had no reasonable prospects of continuing their business based on contemporaneous industry reports reflecting troubled times for the data and telecommunications businesses rather than the positive outlooks expressed at the time by Teleglobe and BCE.

Again, the Court finds that Charnetzki's approach is flawed. In addition to its con-

tractual $1 billion commitment to Teleglobe in June 2000 and its efforts to extend Teleglobe's credit facilities, BCE continued to invest cash to finance Teleglobe's operations. This included board authorization for $75 million in October 2001 and an additional $850 million in November 2001. BCE actually provided Teleglobe with $300 million in additional funding under the board authorizations between November 2001 and April 2002, when the climate in the industry was especially harsh.

As it funded Teleglobe during this period, BCE started Project X to find a viable business plan that would enable Teleglobe to weather the data industry storm. While Teleglobe may have had a deficiency of assets below its liabilities without consideration of BCE's funding, the Court concludes that it did not lack reasonable prospects of continuing its business until April 23, 2002, when BCE announced that it would no longer fund Teleglobe.

The Defendants' expert, Livnat, opined that Teleglobe was not insolvent until it was "virtually certain that there would not be any other opportunity to bail them out by the time that the payments would become due." Livnat determined that date to be as early as the April 23, 2002, BCE board resolution to cease funding and as late as May 2002 when Teleglobe actually defaulted on its debt. While the Court does not endorse this "virtual certainty" test, it finds that under the Third Circuit's solvency standard, Teleglobe and the Debtors had reasonable prospects of continuing their businesses until BCE announced its intention to cease funding.

The Defendants also contend that the balance sheet test is an unreliable indicator of solvency in this case because Teleglobe was a start-up business. *See Francotyp–Postalia AG & Co. v. On Target Tech., Inc.,* No. 16330, 1998 WL 928382, at *5 (Del.Ch. Dec.24, 1998) (dismissing the balance sheet test in favor of the more reliable cash flow test in the context of a start-up company because it "is all too common, especially in the world of start-up companies ... to operate with liabilities in excess of its assets for that condition to be the sole indicia of insolvency.").

The Plaintiffs argue that Teleglobe was not a start-up company because it had been operating since the 1950s and generated significant revenues from its legacy voice business. The Court disagrees with this contention. BCE purchased Teleglobe in 2000 because of Teleglobe's GlobeSystem, which was initiated in May 1999, not because of its voice business. The GlobeSystem was a pivotal element of the acquisition and, therefore, the Court concludes that the Teleglobe which BCE purchased was, at least in part, a "start-up operation."

Consequently, the Court concludes that Charnetzki's balance sheet approach is not persuasive. Therefore, the Court cannot conclude that Teleglobe and the Debtors were insolvent prior to April 23, 2002, when BCE ceased its funding of Teleglobe.

### ii. *Cash Flow Test*

To prove the Debtors' insolvency, Charnetzki also applied the "cash flow test" (also called the "inability to pay debts" test) to determine whether the Debtors were able to pay their debts as they came due in the ordinary course of business. He applied the test to Teleglobe and the Debtors on a consolidated basis as well as to the individual Debtors. Using this test, Charnetzki concluded that the Debtors were insolvent on September 30, 2001, December 31, 2001, March 31, 2002, and April 30, 2002, despite the fact that neither Teleglobe nor the Debtors actually ceased paying its debts as they came due until May 2002.

In reaching this conclusion, Charnetzki again excluded from consideration the funding that BCE actually provided to Teleglobe (and indirectly to Teleglobe's subsidiaries, the Debtors) beyond its initial $1 billion infusion because that funding was not contractually required and, therefore, not certain to come to fruition in the future. The Plaintiffs argue that this "forward-looking" approach is a standard application of the cash flow test and that Charnetzki properly excluded BCE's parental support from his evaluation due to its contingent nature. *See, e.g., Blackmore Partners, L.P. v. Link Energy LLC,* No. Civ. A 454–N, 2005 WL 2709639, at *3 (Del.Ch. Oct.14, 2005) (stating that the cash flow test "examines whether a company can 'reasonably meet its anticipated fixed (on-balance sheet and contingent) obligations as they become due.' ") (citations omitted).

In addition, Charnetzki included the principal balance of the bank debt as an obligation. He noted that Teleglobe's bank facility came due in July 2002 and could not be paid in the absence of BCE's support. Because BCE's support could not be assured, Charnetzki included the fixed bank obligation without considering any parental support. *See, e.g., Mellon Bank, N.A. v. Official Comm. of Unsecd. Creds. of R.M.L, Inc. (In re R.M.L., Inc.),* 92 F.3d 139, 156 (3d Cir.1996) (noting that "if a debtor's treatment of an item as an 'asset' depends for its propriety on the occurrence of a contingent event, a court must take into consideration the likelihood of that event occurring from an objective standpoint."). As a result, Charnetzki concluded that the Debtors were insolvent as defined by the cash flow test during the relevant period.

The Defendants contend that Charnetzki misapplied the cash flow test. The test, the Defendants argue, is not meant to predict whether, in the future, the entity will be able to pay its debts but rather evaluates whether an entity is actually able to pay its debts as they mature in the normal course of business. *See, e.g., Pereira v. Farace,* 413 F.3d 330, 343 (2d Cir. 2005) (rejecting a cash flow test similar to Charnetzki's because that "Cash Flow test projects into the future to determine whether capital will remain adequate over time while the Delaware test looks solely at whether the corporation has been paying bills on a timely basis. . . ."). In this case, the Defendants argue that the Debtors were able to pay all of their debts as they came due through April 23, 2002, when BCE announced it would no longer fund Teleglobe. The Defendants contend that BCE's ongoing support for Teleglobe and the Debtors was evidenced inter alia by the board resolution of November 28, 2001. That resolution, though not a binding contract, authorized an additional infusion of $850 million into Teleglobe. Between that date and April 23, 2002, BCE did provide funding under that authorization to Teleglobe to permit it and the Debtors to pay their debts as they came due. Thus, the Defendants argue that BCE's actual funding of Teleglobe should not have been ignored in Charnetzki's cash flow analysis.

The Court agrees with the Defendants. The cash flow test is "forward looking" in the sense that "[i]t is not enough to be able to meet current obligations; the firm must be able to meet its future obligations as well." J.B. Heaton, *Solvency Tests,* 62 Bus. Law 983, 989 (2007). Even so, the Court finds that it was not appropriate to exclude from the cash flow test the funding support actually given by BCE in determining whether the Debtors were insolvent in the six months before BCE ceased that funding. *See, e.g., In re EBC I, Inc.,* 380 B.R. 348, 359 (Bankr.D.Del.2008) (determining that a company was solvent un-

der the cash flow test because it was "able to pay, intended to pay, and in fact was paying its debts as they came due" as of the relevant date).

The authority that the Plaintiffs cite to bolster Charnetzki's approach does not support his far-reaching conclusion. Indeed, Heaton's article acknowledges that "neither cash flows (sources of assets) nor debt obligations (liabilities) are certain," but they nonetheless must be considered as part of the analysis. 62 Bus. Law at 989. Uncertainty such as that which existed in the funding by BCE is normal in any cash flow analysis.

Further, the Plaintiffs' citation to the *Mellon Bank* case is unavailing as that case dealt with the balance sheet test for insolvency under the Bankruptcy Code, not the Delaware cash flow test. 92 F.3d at 154–56. Even so, in examining a debtor's assets to determine solvency, the Third Circuit in *Mellon Bank* held that "a court looks at the circumstances as *they appeared to the debtor* and determines whether the debtor's belief that a future event would occur was reasonable." *Id.* at 156 (emphasis added). In the instant case, the Court finds that from the Debtors' perspective, BCE's support was not uncertain. Shortly after the acquisition of Teleglobe, BCE injected $1 billion into the company, with professed intentions to continue to support Teleglobe. On November 28, 2001, BCE adopted a board resolution authorizing an additional $850 million in funding to Teleglobe. Between that date and April 2002, BCE actually provided approximately $300 million to Teleglobe. Therefore, it would be reasonable for the Debtors to believe that BCE's funding would continue.

 Thus, the Court concludes that it was inappropriate for the Plaintiffs' expert to exclude from consideration the funding that actually occurred simply because it

was not mandatory. *See, e.g., Iridium Operating, LLC v. Motorola, Inc.,* 373 B.R. 283, 298 n. 5 (Bankr.S.D.N.Y.2007) (discussing Motorola's support of Iridium in the absence of any enforceable commitment for such support and noting that there is nothing to indicate that such "support is not a proper factor to be taken into account in determining solvency").

BCE's actions during the relevant period were consistent with its actions since the acquisition of Teleglobe; it provided continuous financial support to its subsidiary, Teleglobe, and acted as if it intended to continue doing so for the foreseeable future. It appears that BCE's concerns relating to the health of the industry and the viability of Teleglobe arose only in early 2002. Until BCE announced its decision to cease funding Teleglobe on April 23, 2002, however, it was not unreasonable for the Debtors to count on BCE's support for the purposes of a cash flow analysis. By failing to do so, the Court concludes that Charnetzki's cash flow test is flawed.

Further, Charnetzki's conclusion that the Debtors were insolvent between November 2001 and April 2002 because the bank loan came due in July 2002 and could not be refinanced is equally flawed. There is no evidence that prior to April 23, 2002, the Debtors were not paying current debt service on that loan. Further, the loan had been renewed with BCE's commitment of $1 billion in 2000 and with BCE's statement that it "intended" to continue to support Teleglobe in 2001. Therefore, from the Debtors' perspective, it was reasonable to assume that, with BCE's support, the loan would again be renewed in 2002.

Because Teleglobe (and the Debtors) reasonably relied on the support of BCE and actually paid their debts as they came due, the Court finds that Teleglobe and

the Debtors were solvent under the cash flow test until April 23, 2002, when BCE announced that it would no longer fund Teleglobe.

Therefore, the Court concludes that the Plaintiffs have failed to prove insolvency between November 2001 and April 2002 under either the cash flow or the balance sheet test. As a result, the Plaintiffs have failed to satisfy the first requirement of *Garner*. Therefore, the Court need not consider the second element of the *Garner* test (whether there is good cause for production). The Court concludes that the Plaintiffs cannot compel production of the documents at issue by means of the *Garner* fiduciary exception.

## IV. *CONCLUSION*

For the reasons stated above, the Court will deny both the Spoliation Motion and the Motion to Compel.

An appropriate Order is attached.